**THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION**

| | | |
|---|---|---|
| KEITH HERNANDEZ, | § | |
|       Plaintiff, | § | |
|   vs. | § | |
| | § | CIVIL ACTION NO. 2:13-CV-00134-J |
| | § | (Jury Trial Demanded) |
| BNSF RAILWAY COMPANY, | § | |
|       Defendant. | § | |

**DEFENDANT BNSF RAILWAY COMPANY'S BRIEF IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT**

Jeffrey J. Wolf   (Lead Counsel)
Texas Bar No. 21849012
jwolf@wolflawpc.com
Lauren M. Lockett
Texas Bar No. 2401336
llockett@wolflawpc.com
THE WOLF LAW FIRM, P.C.
1360 N. White Chapel Blvd.
Southlake, Texas  76092
(817) 552-9653
(817) 552-0300 (fax)
    *and*
Andrew Evans   (Local Counsel)
Texas Bar No. 00796519
andrew.evans@sprouselaw.com
SPROUSE SHRADER SMITH, P.C.
Amarillo Office
701 S. Taylor St., Suite 500
Amarillo, TX 79101
(806) 468.3340
(806) 373-3454 (fax)
**ATTORNEYS FOR DEFENDANT
BNSF RAILWAY COMPANY**

`

## TABLE OF CONTENTS

TABLE OF CONTENTS........................................................................................................i

TABLE OF AUTHORITIES ...............................................................................................ii

I.      SUMMARY ...........................................................................................................1

II.     EVIDENCE RELIED UPON ................................................................................2

III.    UNDISPUTED FACTS .........................................................................................2

IV.     ARGUMENT & AUTHORITIES ......................................................................10

        A.      Summary Judgment in a FELA Case....................................................10

        B.      The FELA is a Negligence-Based System.............................................14

        C.      Hernandez's Theory that BNSF Could Have Employed a Safer Alternative
                Method to Perform the Task is Not Legally Viable................................15

        D.      BNSF Provided Hernandez with Sufficient Manpower to Perform the
                Task........................................................................................................18

        E.      Hernandez Cannot Recover Based on Track Conditions Encountered as
                Part of His Job Duties. ..........................................................................19

        F.      Hernandez Cannot Establish Foreseeability—an Essential Element of his
                FELA Claim............................................................................................22

        G.      Asking and Employee to Perform a Reasonably Safe Task is Not Evidence
                of Negligence. ........................................................................................23

V.      CONCLUSION....................................................................................................24

VI.     CERTIFICATE OF SERVICE ..........................................................................25

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

CASES

*Adams v. CSX Transp. Inc.*, 899 F.2d 536 (6th Cir. 1990) ......................................14, 15

*Aparicio v. Norfolk & W. Ry. Co.,* 84 F.3d 803 (6th Cir. 1996) ..............................14, 15

*Atchison, Topeka & Santa Fe Ry. Co. v. Buell*, 480 U.S. 557, 107 S.Ct. 1410 (1987) ................14

*Atl. Coast Line R.R. Co. v. Dixon*, 189 F.2d 525 (5th Cir. 1951) ............................15, 17

*Barnett v. Terminal Railroad Association of St. Louis*, 228 F.2d 756 (8th Cir. 1956)................20

*Basinger v. CSX Transp., Inc*. 1996 WL 400182 (6th Cir. 1996), *cert. denied*, 519 U.S.
    1111 (1997)........................................................................................22, 23

*Bauer v. Great N. Ry. Co*., 150 N.W. 394 (Minn. 1915) ...........................................21

*Beeber v. Norfolk S. Corp*., 754 F. Supp. 1364 (N.D. Ind. 1990)..................................18

*Blair v. Batimore & O. R.R.,* 323 U.S. 600, 65 S.Ct. 545 (1945) ................................18

*Brady v. S. Ry. Co.,* 320 U.S. 476, 64 S.Ct. 232 (1943) ........................................24

*Chicago & Nw. Ry. Co. v. Bower*, 241 U.S. 470 (1915)............................................17

*Chicago, R.I. & Pac. R. R. v. Lint*, 217 F.2d 279 (8th Cir. 1954)................................15

*Consol. Rail Corp. v. Gotshall*, 512 U.S. 532, 114 S.Ct. 2396 (1994)..........................14, 21

*Conway v. Consol. Rail Corp*., 720 F.2d 221 (1st 1983).....................................20, 21, 23

*Coomer v. CSX Transp., Inc*., No. 95-6106, 1996 WL 525433 (6th Cir. Sept. 13, 1996)............18

*CSX Transp., Inc. v. McBride*, 131 S. Ct. 2630 (2011)............................................2

*Freese v. Norfolk S. Ry. Co*., No. 1:00CV-0108, 2000 WL 33347653 (N.D. Ind. Sept. 19,
    2000) ..............................................................................................20

*Gallick v. Baltimore & O. R.R*., 372 U.S. 108, 83 S.Ct. 659 (1963) ............................15

*Hamilton v. CSX Transp., Inc.,* No. 3:08 CV 2601, 2009 WL 3353557, *1 (N.D. Ohio
    Oct. 15, 2009) ....................................................................................18

*Hane v. Nat'l Passenger R.R. Corp*., 110 F.3d 573 (8th Cir. 1997)................................17

*Lewis v. CSX Transp., Inc.,* 778 F. Supp.2d 821 (S.D. Ohio 2011)..............................11, 19

*McGinn v. Burlington N. Ry. Co.*, 102 F.3d 295 (7th Cir. 1996)......................................................4

*McKennon v. CSX Transp., Inc.*, 897 F. Supp. 1024 (M.D. Tenn. 1995), *aff'd,* 56 F.3d 64
  (6th Cir.1995)....................................................................................................................1, 19, 24

*Montgomery v. CSX Transp., Inc.* 376 S.C. 37, 656 S.E.2d 20 (S.C. 2008).................................18

*Osteguin v. S. Pac. Transp., Corp.*, 144 F.3d 1293 (10th Cir. 1998) ...........................................17

*Parson v. CSX Transp., Inc.,* 714 F.Supp.2d 839 (N.D. Ohio 2010)..............................................23

*Potrykus v. CSX Transp., Inc.,* 2010 WL 2898782, *1 (N.D. Ohio July 21, 2010)......................21

*Rogers v. Mo Pac. R.R. Co.*, 352 U.S. 500, 77 S.Ct. 443 (1957)...................................................10

*Ross v. Chesapeake & O. Ry.*, 421 F.2d 328 (6th Cir. 1970).........................................................18

*S. Ry. Co. v. Fox*, 339 F.2d 560 (5th Cir. 1964)............................................................................17

*Smith v. Consol. Rail Corp.*, 91 F.3d 144 (6th Cir. 1996) ............................................................22

*Soto v. S. Pac. Transp. Co.*, 644 F.2d 1147 (5th Cir. 1981) ...........................................14, 16, 18

*Stevens v. Bangor & Aroostook Ry. Co.,* 97 F.3d 595 (1st Cir. 1996)..........................................22

*Stillman v. Norfolk & W. Ry.*, 811 F.2d 834 (4th Cir. 1987) ........................................................15

*Thornton v. Atchison, Topeka & Santa Fe Ry. Co.*, 11 F. Supp.2d 1311 (D. N.M. 19997) ..........17

*Tootle v. CSX Transp.*, 746 F. Supp.2d 1333 (S.D. Ga. 2010) .................................................10, 12

*Van Gorder v. Grand Trunk W. R.R. Inc.*, 509 F.3d 265 (6th Cir. 2007) ......................................14

*Volner v. Union Pac. R. Co.*, 509 Fed. Appx. 706 (10th Cir. 2013)...............................................10

*Wood v. S. Pac. Co.*, 337 P.2d 779 (Or. 1959) ...........................................................................20

*Zarecki v. Nat'l Passenger R.R. Corp.,* 914 F. Supp. 1566 (N.D. Ill.1996)...................................24

## I.   SUMMARY

In this Federal Employers Liability Act ("FELA") lawsuit, Plaintiff Keith Hernandez ("Hernandez"), a BNSF Maintenance of Way track laborer, alleges low back pain resulting from swinging a sledgehammer to remove rail joint bars in BNSF's Amarillo railyard on July 2, 2012. Hernandez claims that BNSF failed to provide him with a reasonably safe workplace and work methods.  Hernandez hypothesizes several possibilities of things BNSF could have done to make the job safer (*i.e.*, "stop[ped] the work," "[dis]continued use of hand tools, including a sledgehammer," "timely use[d] the backhoe," used "safe alternative tools and equipment," and/or "provide[d] an adequate crew"). However, Hernandez's hindsight/would have/could have/should have analysis is misplaced.  It is black-letter law under the FELA, that the "proper inquiry is whether the method prescribed by the employer was reasonably safe, not whether the employer could have employed a safer alternative method for performing the task."  *McKennon v. CSX Transp., Inc*., 897 F. Supp. 1024, 1027 (M.D. Tenn. 1995), *aff'd,* 56 F.3d 64 (6th Cir.1995).

Hernandez has not a scintilla of evidence to establish that BNSF's workplace and work method were unreasonably unsafe.  Hernandez admits that the sledgehammer he used was a safe tool being properly used to strike a rail joint.  He and his co-workers took turns using the sledge hammer in a safe manner without overexerting as they had been trained.  BNSF had no inkling that using a sledgehammer in a safe manner could result in injury.   Without proof of foreseeability, there is no jury issue.  Asking an employee to safely perform his job even when that job takes longer than expected is not negligence.  Accordingly, summary judgment should be granted.

## II.   EVIDENCE RELIED UPON

BNSF relies on the pleadings and summary judgment evidence in the Appendix:

Exhibit A        Deposition Excerpts of Plaintiff Keith Hernandez

Exhibit B        Deposition Excerpts of Foreman John Rusler

Exhibit C        Deposition Excerpts of Co-worker Pete Place

Exhibit D        Plaintiff's Personal Injury/Occupational Illness Report

Exhibit E        Report of Inspection

Exhibit F        Deposition Excerpts of Alan Blackwell, Plaintiff's Liability Expert

Exhibit G        Affidavit of Elaina Serina, BNSF's Liability Expert.

## III.   UNDISPUTED FACTS

BNSF relies on the following undisputed facts:

1.      Hernandez began working in BNSF's Maintenance of Way Department as a track laborer on August 20, 2007. [*Appendix p. 3* (21:20-23)].   As a track laborer, his job duties included maintaining, repairing, and−as warranted−replacing defective track components in the Amarillo yard. [*Appendix p. 9* (56:4-13)].   During the five years prior to the alleged incident, Hernandez routinely used hand tools, including a sledgehammer, to perform his work duties without incident. 2.      On July 2, 2012, Hernandez was assigned to a four-main crew to perform routine maintenance in BNSF's Amarillo railyard.   [*Appendix p. 5* (33:8-23)].    Three crewmembers−Hernandez, Pete Place, and foreman John Rusler−were performing manual tasks and crewmember Mike Harris was assigned to operate the backhoe.  [*Appendix p. 4-5* (27:3-4; 32:4-11; 33:24-34:9)].

3.      At the time of the alleged incident, the crew was in the process of changing out two sets of insulated rail joint bars with non-insulated bars, a total of four bars−"a pretty simple, menial

task that shouldn't have taken very long, . . . shouldn't have been a 30-minute job." [*Appendix p. 25* (9:6-8)].   After a safety briefing, securing track protection, and gathering the necessary tools, the crew began unbolting the old joint bars from the rail.   [*Appendix p. 26-27* (14:2-18:11); *Appendix p. 11* (63:4-23)].

4.      The bolts and joint bars were being replaced because they were "extremely worn, extremely rusted."   [*Appendix p. 8* (50:5-6)].   Most of the nuts were removed from the bolts using a hydraulic impact wrench, but a torch was used to remove a couple of the more stubborn nuts.   [*Appendix p. 11* (64:25-65:18)].   The crew then took turns swinging a twelve-pound sledgehammer ("a pretty typical sledgehammer") against a punch to drive the bolts out, and then attempted to knock the metal joint bars from the rail. [*Appendix p. 11-14* (65:19-66:6; 66:15-67:17; 68:5-10; 75:20-21)]. When it became apparent that they could not sufficiently loosen the joint bars using only a sledgehammer, the crew used a number of other tools−including a pry bar and a wedge (or chisel)−to create a gap between the joint bars and the rails sufficient to accommodate the teeth of the backhoe bucket which was then used to finish prying the joint bars off the rail.   [*Appendix p. 28* (25:3-11)].    In the course of performing this work, Hernandez did not report any injury.   [*Appendix p. 15-16* (81:20-82:4; 84:14-16); *Appendix p. 30* (3:6-10); *Appendix p. 38*   (29:5-23)].   The crew then installed the new non-insulated rail joints and finished work for the day.

5.      The next morning, Hernandez called Roadmaster Jeffrey Soukup and first complained of back pain and stiffness and reported that he thought he had injured himself while swinging the sledgehammer to remove the joint bars.   [*Appendix p. 16* (84:18-20).   Thereafter, Hernandez completed a BNSF Personal Injury Report stating, "while trying to hit the insulated joints off with a 12 pound hammer suddenly felt a sharp in lower right back."   [*Appendix p. 45*].

3

Hernandez's co-workers were then interviewed and each stated that they were completely unaware of any injury, and that Hernandez never complained or mentioned any pain or injury on July 2nd.  A post-incident inspection of the sledgehammer found no defects.  [*Appendix p. 47*].

6.      All railroad workers, including Hernandez, are empowered not to engage in any task which might cause injury and to take the safe course when in doubt, and during his deposition Hernandez confirmed:  "I always try to take the safe path."  [*Appendix p. 7 (42:16)*].

7.      Hernandez admitted in his deposition:

- BNSF provided him with good training. [*Appendix p. 4 (29:21-11)*].

- He knew how to use a sledgehammer and had used one "hundreds of times out there on the job" without incident.  [*Appendix p. 5 (31:2-9)*].

- A sledgehammer is one of a trackman's "tools of the trade" and is a "common tool" used in the railroad industry. A sledgehammer is a good tool when you need to pound on something. [*Appendix p. 5 (31:10-19)*].  A sledgehammer is a safe tool if used properly. [*Appendix p. 13 (71:1-5)*].

- Hernandez had a full four-man crew to complete the job.  [*Appendix p. 5 (33:4-23)*].

- As a track laborer in Amarillo, his duties included performing maintenance in the Amarillo yard, "replac[ing] defective stuff"; and changing out rusted and/or corroded parts of the rail structure including rail joint bars.  [*Appendix p. 9-10 (56:4-13; 58:3-10)*].

- Using a sledgehammer to hit a punch was an appropriate use of the tool and what he had been taught to do.  [*Appendix p. 12 (69:8-19); p. 15 (80:4-7)*].

- He did not misuse the sledgehammer or use it in anyway other than how he had been taught. [*Appendix p. 13 (70:22-25)*].

- He used the sledgehammer properly, used good posture, swung it as he always had− "[n]ormal swings," and did not overexert, was "swinging that sledgehammer in a safe manner," "didn't feel like [he was] putting his back at risk," and was "not doing anything with [the sledgehammer] that [he] thought would cause . . . injury."  [*Appendix p. 13-14 (71:6-10); (72:5-9;73:23-74:3); p. 17 (91:11; 92:22-93:8)*].

- He never complained about the task being performed or the work method. [*Appendix p. 13 (73:17-25)*].

- The crew members took turns swinging the sledgehammer and "anytime" he was tired he would hand off to another crewmember, including his "boss." [*Appendix p. 20* (112:2-9)].

- In performing his part of the task, he swung the sledgehammer more than 10 but less than 20 times. [*Appendix p. 13* (71:11-19)].

- The sledgehammer he was using at the time of the alleged incident was "a safe sledgehammer"; there was "[n]ot a thing wrong with that sledgehammer"; "[i]t was a safe tool for the day." His "sledgehammer was fine," was not defective, and Hernandez could not identify any defects with any of the tools used to perform the task. [*Appendix p. 14-15* (77:18-78:1); *p. 21* (114:5-16)].

- At the time of the alleged incident, BNSF asked him to use "that safe tool" as part of his "job responsibilities" and Hernandez "didn't see anything unsafe about using that tool to do his job responsibilities." [*Appendix p., 15* (78:1-9)].

- No one told Hernandez "to swing it in any way that was in any way unsafe." [*Appendix p. 15* (78:18-20)].

- Hernandez "believed he was using a safe tool" and "didn't think there was anything unsafe about hitting a punch or hitting a bolt or hitting a bar" with the sledgehammer. [*Appendix p. 14-15* (77:18-78:12; 80:2-7)].

- Hernandez never told his foreman he "didn't want to do it anymore," was "getting tired," was "getting sore from swinging from swinging [the sledgehammer]," or that he'd done anything to hurt himself. [*Appendix p. 15-16* (81:20-82:2; 84:14-16)].

- "[BNSF didn't] do anything wrong asking [Hernandez] to use a sledgehammer" to perform his work. [*Appendix p. 17* (92:5-7)].

8.     Similarly, Hernandez's co-workers testified that they took turns swinging the sledgehammer and that they had no concerns regarding the work method:

- The crew was not shorthanded for the task, "we had plenty of people for [the job task]." [*Appendix p. 41* (49:17-21)].

- The crew took turns swinging the sledgehammer to hit the punch, and hitting the rail joint bars. [*Appendix p. 36-37* (20:9-21:3; 22:2-24)]. Q. "Did ya'll evenly divide up the time that was spent swinging the sledge?" A. ". . . [Hernandez and Rusler] swung at it more than I did." [A*ppendix p. 39* (30:16-19)]. Q. "And you beat on the bars about four times?" A. "Yes. . . . Four or five times." Q. "John Rusler beat on the bars?" A. "Yes." Q. "And Keith Hernandez beat on the bars?" A. "That's correct." Q. "And Rusler and Hernandez kept taking turns beating on the bar?" A. "Yes." [*Appendix p. 43* (63:1-11)].

- No crewmember was doing anything he thought could result in injury.  [*Appendix p. 37 (24:13-15)*].

- The crew was using the sledgehammer for the purpose it was intended.  [*Appendix p. 37 (24:16-18)*].

- A track crew uses a sledgehammer "[e]very day, pretty much," and it is a "good tool." [*Appendix p. 37-38 (24:19-21; 26:5-6)*].

- Hernandez did not complain to anyone, Hernandez did not act like he was hurting in any way, and Place was "surprised" when learned the next day that Hernandez was claiming something was wrong with his back: Q. "Did you have any inkling that he'd hurt himself?" A. "No."  [*Appendix p. 38*, (29:5-23)].  "I didn't know he was hurt."  [*Appendix p. 40 (35:8)*].

- Co-worker Place was not concerned about the amount of time the crew was swinging the sledgehammer, and he did not have any concerns about the method employed to perform the task.  [*Appendix p. 39 (31:13-19)*].

- Working overtime is part of the job.  Q.  "[S]ometimes you have to work overtime when you have something that's unforeseen on a job like this? . . . Like when you encounter something you don't expect."  A.  "Yeah, absolutely."  . . . Q. "Is that just part of being a railroader?" A.  "Yeah.  Yeah, absolutely."  Q.  "Were you concerned that you had to work overtime that day?"  A.  "No."  [*Appendix p. 39 (32:22-33:10)*].

- It was a "simple job that took longer than it should have."  [*Appendix p. 42 (55:16-19)*].

- The crew shared the work.  [*Appendix p. 27-28*, (20:18-23:4)].  No one continuously swung the sledgehammer.  (*Appendix p. 29 (26:6-25)*)

- No one was overexerting himself and no one complained.  [*Appendix p. 29 (27:1-4, 8)*].

- Further, Rusler didn't think anybody did anything unsafe.  "[W]e did everything safe." [*Appendix p. 31 (35:21-36:1)*]. Q. "Do you think there was anything unsafe  . . . about the workplace on the day of this incident?"  A.  "No, sir, I don't."  [*Appendix p. 32 (39:2-7)*].

- Rusler observed Hernandez use the sledgehammer and the various other tools that day and never saw Hernandez wince, hold his back, complain, or in any way indicate that he had hurt himself.  (Appendix30, 30:18-31:1).  He didn't see Hernandez do anything that could cause injury.  (Appendix30, 31:18-24).  "[H]e never appeared to have an injury, never said anything to me."  [*Appendix p. 30 (33:7-8)*].

- "I believe we did the job in a safe manner.  I mean, I don't know what could have been done different to have accomplished the job other than doing a completely different job than what we were asked to do."  [*Appendix p. 31 (37:11-14)*].

- The use of a sledgehammer was just a normal part of the job that day; "that's a tool we use [everyday]," "it's probably the main tool that we use . . . on the majority of jobs on a section." [*Appendix p. 31* (37:16-23)].

- Rusler did not ask Hernandez to do anything that he didn't do that day, "[n]ever have," and did not think he was asking himself to do anything unsafe that day. [*Appendix p. 31-32* (37:24-38:4)].

- "[T]here's no way to use a backhoe until we got the bars in a position where the backhoe could be used, because, . . . those bars are tight up against the rail. . . . [T]here's no way for the backhoe to get a bite on those bars to—we had to get [the bars to a point] that the backhoe could get his teeth in there and just start to do something mechanic.". . . "We ended up getting that bar away from the rail enough with that wedge, that chisel, wedging it in there to finally get it where the backhoe was able to get his teeth in between the back side of the bar and the ball of the rail to start prying those apart." [*Appendix p. 28* (24:18-25; 25:3-11)].

9.      Applying subjective hindsight, Hernandez's only complaint was that BNSF could have employed a safer alternative method to perform the task:

- Q.   "What should you have had?" A.   "I don't know, something more mechanical." [*Appendix p. 18* (95:18-19)].

- "I believe that there would have been other safer methods and ways of repairing that defect. [*Appendix p. 19* (107:4-5)].

- "We could have tried from the start to use the backhoe.  That's the only thing I can think of." [*Appendix p. 20* (111:3-4)].

8.      Notably, Hernandez admitted that he never suggested to his crew or supervisor that he believed there was a safer method to perform the task.  At the time, it never occurred to him that "it was an unsafe job." [*Appendix p. 20* (110:7-10)].

9.      Hernandez's liability expert echoed this testimony in his deposition:

- Hernandez never voiced any exception to the manner in which the work was being performed.  [*Appendix p. 50* (17:6-12)].

- When a bolt can't be removed with an impact wrench, a torch is a proper way to remove the bolt; and he took no exception on that method.  [*Appendix p. 51* (22:1-8)]

7

- Hernandez used the sledgehammer as he had "properly been taught"; he took no exception to the manner in which Hernandez was using the sledgehammer; and "Hernandez] wasn't exerting." [*Appendix p. 51 (23:1-4; 25:3-5)*].

- Blackwell took no exception to "using a sledgehammer to strike another tool, like a long-handled punch." [*Appendix p. 52 (26:22-27:1)*]. Using a sledgehammer to strike a punch is an approved use, "that is an approved use of a sledgehammer." [*Appendix p. 54-55 (73:12-16; 79:16-80:2)*].

- He had no criticisms of the sledgehammer; the sledgehammer is a tool that has been "around for a long time," and it's a tool "that's proved its effectiveness over the years." [*Appendix p. 52 (27:12-16; 19-24)*].

- The rules do not prohibit the use of a sledgehammer to strike a rail joint. [*Appendix p. 56 (107:8-12)*].

- Using a sledgehammer to strike a punch is an approved use, "that is an approved use of a sledgehammer." [*Appendix p. 54-55 (73:12-16; 79:16-80:2)*].

- The crew created a gap between the joint bars and the rail using a sledgehammer, pry bars and a wedge" "[t]o actually get them loose" to be able to use the backhoe's teeth to finish off the task. [*Appendix p. 53 (58:9-59:2)*].

10.     Moreover, Blackwell was "not critical" of BNSF's use of a sledgehammer to hit the rail joint, "you can hit a . . . rail joint bar with a sledgehammer," "It can be used to hit a rail joint bar." [*Appendix p. 56 (106:14-17; 107:8-12)*]. Rather, Blackwell admitted that his only criticism of BNSF was "the excessive amount of time that [John Rusler] was instructing and participating in striking that immoveable object." [*Appendix p. 57 (110:21-24)*].

11.      Blackwell believes BNSF is negligent because there were "other safer alternative methods to have performed that job of removing . . . the bar."

> [Y]ou could use the hydraulic maintenance equipment, such as they eventually used. You could actually cut the joint out by removing the rail, cutting the rail joint out by removing the rail, cutting the rail on both sides and taking the complete rail out. And there's one other one I can't—slips my mind. But basically there's two or three other options that you could use to remove that safely. [*Appendix p. 58 (119:10-16)*].

12.     BNSF retained biomechanical expert Elaine Serina to investigate the alleged incident and assess any risks involved in method used to perform the task of removing the rail joint using a sledgehammer.  After conducting a complete investigation of the alleged incident−including a review of the complaint, responses to written discovery, Hernandez's medical records, witness statements, deposition testimony, Mr. Blackwell's expert report, and after conducting an independent inspection of the way tool and tasks at issue−Ms. Serina concluded and it is uncontested that, from a biomechanical standpoint, BNSF provided Hernandez a reasonably safe place to work:

> My biomechanical analysis showed that while performing the task of changing insulated joint bars, the compressive loads on the lumbar spine while using the sledgehammer to strike the insulated joint bars were not excessive and did not exceed the Maximum Permissible Limit indicated in the [National Institute of Occupational Safety and Health ("NIOSH")] Work Practices Guide for Manual Lifting.  NIOSH states that musculoskeletal injury rates have been shown to increase significantly when work is performed above the Maximum Permissible Limit.  Therefore, according to the NIOSH guidelines, the loads on Mr. Hernandez's lumbar spine while using the sledgehammer likely did not increase the risk of a low back injury when performed multiple times over the course of a day, and were acceptable for his work environment.  In addition, the lumbar compressive loads while using the sledgehammer were less than or comparable to those while performing typical daily activities outside the workplace, such as bending forward, taking out the trash, and lifting a box from the ground.  Use of the sledgehammer while changing out an insulated joint bar would not constitute a highly repetitive task, when evaluated over the course of a work day. [*Appendix p. 62*].

13.     Finally, Hernandez can provide no evidence that a low back injury was foreseeable to BNSF from the routine task of using a sledgehammer to hit a rail joint. BNSF had no knowledge of any increased risk of injury resulting from using a common tool to perform a typical work task.

## IV.   ARGUMENT & AUTHORITIES

### A.   Summary Judgment in a FELA Case

The test of a jury case under the FELA is "whether the proofs justify with reason the conclusion that the employer's negligence played any part, even the slightest, in producing the injury . . . for which damages are sought." *Rogers v. Mo Pac. R.R. Co.*, 352 U.S. 500, 506, 77 S.Ct. 443 (1957).   But even under this "lowered [causation] standard, a plaintiff must still produce evidence of negligence.   Summary judgment is appropriate in a FELA case such as this where there is no proof of negligence. *Tootle v. CSX Transp.*, 746 F. Supp.2d 1333, 1340 (S.D. Ga. 2010) ("Trial judges must avoid the temptation to abdicate their duty to rule faithfully on summary judgment motions.   Even in cases where "reasonableness" is the standard, there must still be evidence that the defendant was unreasonable.   When there is no actual evidence of foreseeability and no actual evidence of negligence, a judge must rule accordingly.").

The following cases illustrate that where evidence of negligence is lacking, there is no case for the jury:

- ***Volner v. Union Pac. R. Co.*, 509 Fed. Appx. 706 (10th Cir. 2013).**   Plaintiff Volner worked for Union Pacific ("UP") in various capacities.  *Id.* at 707.   In November 2009, while working as a trackman on a section gang putting in railroad ties, he allegedly injured his neck. *Id.* He did not file an incident report that day, but he told his foreman that his neck hurt and his arm tingled. *Id.*   Nearly a year later, Volner filed his lawsuit asserting a number of claims relating to the safety of the workplace and the demands of the work he was assigned to do.  *Id.*   UP moved for summary judgment asserting Volner failed to demonstrate UP's negligence.  *Id.*

10

The district court granted summary judgment concluding that Volner failed to show a defect in the premises or equipment, UP's notice of the defect, or that he informed UP that his work was causing his problems. *Id.* The Tenth Circuit affirmed:

> We agree with the district court that Mr. Volner, as a matter of law, failed to meet his burden of showing negligence. Although he states that he suffered an acute injury, Mr. Volner could not point to a defective tool or working condition that caused the injury. . . . Union Pacific presented a report from an expert, . . . , that stated Mr. Volner's job duties did not present an increased risk for the development of cervical spine degeneration. Mr. Volner did not challenge the report. At no time did he provide evidence that his job was unreasonably dangerous, or that the tools he used were inadequate, or that his workplace was not safe. The physical demands of his job alone are insufficient to show negligence.
>
> Accordingly, Mr. Volner has not presented any evidence showing that Union Pacific breached a duty by failing to use ordinary care or failing to do what a reasonably prudent person would do to make the work environment safe. Nor has he shown that Union Pacific "knew, or may the exercise of due care should have known that prevalent standards of conduct were inadequate to protect [him]. . . ." Regardless of whether Mr. Volner suffered from an acute injury or a cumulative trauma, he failed to make even a slight showing that Union Pacific was negligent. Thus, we conclude that the district court correctly decided as a matter of law that Mr. Volner failed to show negligence.

*Id.* at 709 (internal citations omitted).

- ***Lewis v. CSX Transp., Inc.*, 778 F. Supp.2d 821 (S.D. Ohio 2011).** Plaintiff Lewis worked in CSX's track department and developed bilateral carpal tunnel syndrome. *Id.* at 824. He filed suit asserting that CSX breached its duty to provide a reasonably safe workplace by failing to provide him with adequate assistance and manpower, adequate tools to safely perform his duties, and an adequate safety program. *Id.* at 828. CSX moved for summary judgment arguing that Lewis failed to present more than a scintilla of evidence of negligence and that he presented no admissible proof of causation. *Id.* at 832. With respect to the adequacy of the tools and equipment provided to him, the court found that Lewis's description of his job duties was insufficient to support his claim. Lewis's testimony described the physical demands of operating

certain equipment, specifying that he was required to repeatedly pull and push levers, that it was sometimes difficult for him to grip the machine's levers, and that operating it required him to place his hands in awkward positions. *Id*. at 836. The court determined that Lewis's testimony, standing alone, was not evidence that his job was unreasonably unsafe or that the railroad required him to perform his job in an unsafe manner. *Id*. at 837.

The court further held that there was no evidence that CSX had actual or constructive knowledge of any problem with the equipment or work method. *Id*. at 838-39. There was no evidence that Lewis reported to anyone that his work or a problem with his work was causing him difficulties with his hands. *Id*. Lewis offered evidence that CSX had knowledge of an increasing number its employees that had filed claims related to carpal tunnel syndrome, but no witness testified as to the jobs those employees held, or the types of tasks they performed, and there was no evidence that any employee operating the same or similar machinery the plaintiff had filed a carpal tunnel claim. *Id*. at 839. The court rejected Lewis's argument that existence of a large number of claims generally equated to evidence that his specific work conditions were unsafe and that CSX knew or should have known of the allegedly unsafe conditions. *Id*.

Finally, in considering Lewis's claim that CSX should have provided a different or better comprehensive training and prevention program, the court determined that "there must be some evidence that the railroad could reasonably have anticipated that an injury is a likely result of certain conditions before it can be said that the railroad breached a duty to address those conditions." *Id*. at 843. Likewise, the court found no evidence that Lewis's work involved risks of which CSX knew or should have known, or that there were additional steps CSX could have taken to avoid the risks. Because there was insufficient evidence of negligence, the court granted summary judgment in favor of CSX. *Id*. at 845.

- ***Tootle v. CSX Transp., Inc.*, 746 F. Supp.2d 1333 (S. D. Ga. 2010).**  Plaintiff Tootle was employed by CSX as a utility worker, including servicing and cleaning locomotives, throwing track switches, cleaning and sweeping restrooms and break areas, transporting materials and cleaning supplies between work areas and storage sites, and washing two or three locomotive engines each day.  *Id.* at 1334.  Tootle's specific alleged acts of negligence included CSX's failure to provide her adequate equipment and assistance to safely perform the duties required of her position, as well as the railroad's failure to warn of the potential dangers of her position through a comprehensive safety or ergonomics program designed to reduce the risk of her injuries.  *Id.* at 1336.  CSX moved for summary judgment on grounds that the plaintiff had failed to adduce any evidence that CSX breached its duty under the FELA to provide her with a reasonably safe workplace.  *Id.*

In an attempt to survive summary judgment, the plaintiff argued that her testimony as to the physically demanding nature of her job was enough to create a triable issue of fact as to CSX's negligence.  The court disagreed:

> Plaintiff has submitted arguments that, at first blush, seem close to acceptable evidence:  her speculation that there might be a lighter hose somewhere, her wishes about having other people perform parts of her job for her, and her quite detailed facts showing that other people who performed other jobs received other injuries to other body part.  But these musings and the statistics about a different injury are not evidence of negligence or foreseeability, not even slightly.  Because FELA is not a workers' compensation or strict liability statute, a plaintiff must still provide some such evidence.  Because plaintiff has failed to put forth even slight evidence, summary judgment must be granted in favor of CSX.

*Id.* at 1336.

Like the foregoing cases, there is no evidence here of negligence or foreseeability and summary judgment should be granted.  All witnesses, even Hernandez's retained expert, agree that a sledgehammer was a safe tool to perform the task of striking rail joints.  Moreover, no

witness has identified any instance where using a sledgehammer for the task being performed was unsafe or created an undue risk of injury. Absent evidence of negligent conduct or foreseeability, there is no case for a jury.

**B.     The FELA is a Negligence Based System.**

The FELA imposes a general duty on railroads to provide a safe workplace, but does not render a railroad an insurer of its employees' safety. *McGinn v. Burlington N. Ry. Co*., 102 F.3d 295 (7th Cir. 1996); *see Consol. Rail Corp. v. Gotshall*, 512 U.S. 532, 543, 114 S.Ct. 2396 (1994) ("FELA does not make the employer the insurer of the safety of [its] employees while they are on duty. The basis of [its] liability is negligence, not the fact that injuries occur."). The FELA is not a workers' compensation statute, but is instead a fault-based scheme and employer negligence is a prerequisite to liability. *Soto v. S. Pac. Transp. Co*., 644 F.2d 1147, 1148 (5th Cir. 1981). To prevail on a FELA claim, a plaintiff must prove the traditional common law elements of negligence−namely, duty, breach of the duty, foreseeability of the injury, and causation. *Aparicio v. Norfolk & W. Ry. Co.,* 84 F.3d 803, 810 (6th Cir. 1996); *Adams v. CSX Transp. Inc*., 899 F.2d 536, 539 (6th Cir. 1990).

Under the FELA, "[a] railroad has a duty to use reasonable care in furnishing its employees with a safe place to work." *Atchison, Topeka & Santa Fe Ry. Co. v. Buell*, 480 U.S. 557, 558, 107 S.Ct. 1410 (1987). That "does not mean that a railroad has the duty to eliminate all workplace dangers." *Van Gorder v. Grand Trunk W. R.R. Inc*., 509 F.3d 265, 269 (6th Cir. 2007). Rather, a railroad only has the duty "to use ordinary care under the circumstances," or "to do what a reasonably prudent person would have done under the circumstances to make the working environment safe." *Id*.

A railroad breaches this duty to employees only when it "'knew, or by exercise of due care should have known' that prevalent standards of conduct were inadequate to protect [the plaintiff] and similarly situated employees." *Aparicio*, 84 F.3d at 811 (quoting *Urie v. Thompson*, 337 U.S. 163, 178, 69 S.Ct. 1018 (1949)). "The test is not whether the tools to be used and the place in which the work is to be performed are absolutely safe, nor whether the employer knew the same to be unsafe, but whether or not the employer has exercised reasonable care and diligence to make them safe." *Atl. Coast Line R.R. Co. v. Dixon*, 189 F.2d 525, 527 (5th Cir. 1951).

Finally, the railroad must also be able to foresee injury to the plaintiff in order to be found liable under the FELA. *Adams*, 899 F.2d at 539. Under the FELA, an employer is not liable for breaching its duty to provide a safe workplace "if the employer had no reasonable way of knowing that potential hazards existed." *Gallick v. Baltimore & O. R.R.*, 372 U.S. 108, 117, 83 S.Ct. 659 (1963).

**C.    Hernandez's Theory That BNSF Could Have Employed a Safer Alternative Method to Perform the Task is Not Legally Viable.**

Hernandez asserts, in several hypotheticals, that BNSF was negligent because it failed to use a "reasonably safer alternative work method. The fact that there may have been a safer alternative method than that employed, or that risk may have been avoided by performing the task in a different manner, however, does not render the chosen method negligent for purposes of the FELA. *Chicago, R.I. & Pac. R. R. v. Lint*, 217 F.2d 279, 282-83 (8th Cir. 1954). Under the FELA, the only proper inquiry is whether the method employed by the railroad was reasonably safe, not whether the railroad could have utilized a safer alternative method for performing the task. *Stillman v. Norfolk & W. Ry.*, 811 F.2d 834, 838 (4th Cir. 1987).

"That there are other, arguably more advanced, methods in use by the defendant for [accomplishing the task at hand] is of no significance where the method in use [by plaintiff] was not an inherently unsafe one." *Soto*, 644 F.2d 1147 at 1148. Where "[t]he task at which [plaintiff] was injured was one that could be safely done by the method which he was told to use and was using," the employer is not negligent by refusing to provide plaintiff with an automated means for accomplishing the task. *Id.*

Hernandez does not argue that the method employed to perform the task was unsafe; rather his sole theory is that a safer alternative method could have been used to perform the task. Hernandez testified he could have avoided injury if he crew:

> "Possibly cut out the rusted piece [with a saw], pull it out and replace it with a [new piece of] rail." [*Appendix p. 19* (109:17-25; 150:5-10)]; _or_ "We could have tried from the start to use the backhoe. That's the only thing I can think of." [*Appendix p. 20* (111:1-4).

His expert Alan Blackwell echoed this testimony:

> Q.     Are there other reasonably safe alternative methods to have performed that job of removing these—the bar?
> A.     Yes, sir.
> Q.     And what are those reasonably safe methods?
> A.     Again, you could use hydraulic maintenance equipment, such as they eventually used.  You could actually cut the joint out by removing the rail, cutting the rail on both sides and taking the complete rail out.  [*Appendix p. 58* (119:1-14)].

These alternative methods, however, do not demonstrate that the method used was unsafe. While Hernandez described the difficulty the crew encountered performing the task−i.e.,"we weren't being able to get [the rails] off" (Appendixp. 20, 110:13-14)−his testimony shows nothing more than he experienced greater than expected difficulty performing the normal functions of his job.  Without more, this testimony is not evidence that his workplace was unreasonably unsafe or that BNSF required him to perform the job in an unreasonably unsafe

manner. *See Dixon*, 189 F.2d at 527 (recognizing even where there is evidence of an alternative method of operation that is safer, failure to use such method does not establish negligence); *S. Ry. Co. v. Fox*, 339 F.2d 560, 563 (5th Cir. 1964) (same).

It is undisputed that the sledgehammer was a safe and suitable tool for the task of striking a rail joint. To survive summary judgment, Hernandez must raise a genuine issue of material fact that the tools and equipment he was provided were *underlined* *unreasonably unsafe*, not that the tools were not the best or latest models or that he preferred other tools. *Chicago & Nw. Ry. Co. v. Bower*, 241 U.S. 470, 473-74 (1915). A railroad is not required to provide the best, latest, or safest tools or equipment possible; rather, it is only required to provide reasonably safe and suitable tools and equipment. *Id*.; *Osteguin v. S. Pac. Transp., Corp*., 144 F.3d 1293, 1296 (10th Cir. 1998) (railroad not liable for failing to provide employees with rubber boots or booties because employee did not establish that failure to provide protective footwear was unsafe); *Hane v. Nat'l Passenger R.R. Corp*., 110 F.3d 573, 574-75 (8th Cir. 1997) (railroad not required to furnish plastic tubs with handles, even if a better alternative); *Thornton v. Atchison, Topeka & Santa Fe Ry. Co*., 11 F. Supp.2d 1311, 1313 (D. N.M. 1997) (plaintiff claim that he should have been supplied with a different type of wrench was rejected where there had been no evidence that the wrench used by the plaintiff was the wrong size or not otherwise reasonably safe).

The mere fact that Hernandez felt that employing another method would have been easier than continued use of the sledgehammer does not indicate that use of the sledgehammer was inherently or unreasonably unsafe. *See McKennon,* 897 F. Supp. at 1027 ("The fact that there may have been an automated, or safer method, of work does not automatically render the chosen method unsafe or negligent for purposes of FELA. Under the FELA, the proper inquiry is whether the method prescribed by the employer was reasonably safe, not whether the employer

could have employed a safer alternative method for performing the task." (internal citation omitted)); *Soto,* 644 F.2d at 1148 ("That there are other, arguably more advanced, methods in use by the defendant for [accomplishing the task at hand] is of no significance where the method in use by [the plaintiff] was not an inherently unsafe one.").

## D.      BNSF Provided Hernandez with Sufficient Manpower to Perform the Task.

Hernandez also alleges insufficient manpower as a basis for his claim.   Courts have recognized that "employers must provide workers with sufficient manpower to accomplish an assigned task" as part of their duty to provide a safe work place.   *See, e.g., Coomer v. CSX Transp., Inc.,* No. 95-6106, 1996 WL 525433, at *2 (6th Cir. Sept. 13, 1996) (citing *Blair v. Baltimore & O. R.R.,* 323 U.S. 600, 604-05, 65 S.Ct. 545 (1945)).   In cases where plaintiffs have survived summary judgment on such claims, the plaintiffs have presented evidence that they were forced to perform a particular task that required more assistance and that it was unreasonable to require the plaintiff to perform the task alone without assistance. *See, e.g., Ross v. Chesapeake & O. Ry.,* 421 F.2d 328 (6th Cir. 1970) (plaintiff injured because he was required to lift or drag a 600 pound barrel by himself); *Hamilton v. CSX Transp.,* Inc., No. 3:08 CV 2601, 2009 WL 3353557, at *3 (N.D. Ohio Oct. 15, 2009) (denying CSX's motion for summary judgment on plaintiff's FELA claim where there was evidence that the foreman failed to provide plaintiff help carrying a 100 pound keg, such assistance was reasonably available, and CSX knew the risks involved in having an individual loft the 100 pound keg without assistance); *Beeber v. Norfolk S. Corp.,* 754 F. Supp. 1364, 1372 (N.D. Ind. 1990) (finding sufficient evidence to allow issue of inadequate assistance to be considered by jury where plaintiff showed that although he had recently sustained a hernia injury, employer assigned him to a 100-car train with only two other employees well knowing that lengthy freight trains have separated in the

past and that repairs would require plaintiff to lift heavy equipment); *Montgomery v. CSX Transp., Inc.* 376 S.C. 37, 43-44, 54-55, 656 S.E.2d 20, 23-34, 29-30 (S.C. 2008) (holding plaintiff presented sufficient evidence where plaintiff submitted affidavits of two expert witnesses who stated it was unreasonable and went against common industry practice for the railroad to assign plaintiff to a particular task without assistance).[1]

Even assuming *arguendo* that Hernandez can establish that more assistance would have made his job easier or would have allowed him to complete his job in a shorter time, such evidence does not demonstrate that BNSF was negligent for failing to provide such assistance. *See McKennon*, 897 F. Supp. at 1027 ("[T]he fact that [the p]laintiff's job would have been easier if there had been more workers does not constitute negligence on the part of Defendant, more does it create an unreasonably unsafe work environment.").  Instead, Hernandez would have to present some evidence that working overtime created an unreasonably unsafe work environment. *See Lewis v. CSX Transp. Inc.*, 778 F. Supp.2d 821, 840 (S.D. Ohio 2011) ("If evidence of overtime alone would suffice, any employee . . . would be able to establish a jury question as to inadequate manpower simply by showing he or she . . . worked extended hours."). This Hernandez has not and, on the record before this Court, cannot do.

**E.**     **Hernandez Cannot Recover Based on Track Conditions Encountered as Part of His Job Requirements.**

Several of Hernandez's allegations are directed at the defective condition of the track components he encountered at the time of the alleged incident:

- "the nuts were ***solidly rusted*** to the bolts and the metal insulated joint bars were ***solidly rusted*** to the rail"

---

[1] The undersigned is unaware of any case in which a FELA plaintiff survived summary judgment on an inadequate assistance or lack of manpower claim based solely on the fact that the plaintiff worked overtime, particularly where, as here, there is no evidence that the plaintiff objected to the overtime work or raised concerns about the physical effects of working extended hours.

- "BNSF *failed to maintain its tracks* in compliance with its rules or with accepted recommended practices within the railroad industry"

- BNSF failed to adequately inspect the *rusted track components* before commencing the work";

- BNSF "failed to properly evaluate the task and remedy the *unsafe condition*"

Reasonable care must be reasonable in light of the normal requirements of the job.  A yardman dealing with moving cars cannot expect the same safety as a clerical worker in a ticket office." *Conway v. Consol. Rail Corp.*, 720 F.2d 221, 223 (1st 1983).  *Barnett v. Terminal Railroad Association of St. Louis*, 228 F.2d 756 (8th Cir. 1956) is especially instructive on this issue.  In *Barnett*, the plaintiff, an experienced car inspector and repairman, sustained injuries while tightening a leaking steam line coupling.  *Id*. at 758.  The court acknowledged that the "defendant negligently set cars in its yards in cold weather with the air and steam line disconnected so that ice formed on the air brake hose coupling causing it to burst apart and injure the plaintiff."  *Id*. at 758.  The appellate court affirmed the district judge's directed verdict for the railroad, reasoning:

> This plaintiff was according to his testimony a car inspector and repairman.  As such, it was his duty to make such repairs on these hose[s] as was necessary to allow them to couple safely.  This mechanism, it may be said, was in bad repair when he went on duty and it was his job, and his job alone, to make the necessary repairs. . . .  A mechanic could not, we think, be heard to complain that it was the negligence of his employer that caused the mechanism to get out of repair.  It might be said that there would be no occasion for the mechanic to perform any duty if the mechanism were not out of repair.  By analogy, we may consider the case of an automobile mechanic.  The owner of a car through his own negligence has had a collision resulting in damage to the car.  The mechanic is called to repair it.  If injured in doing so, he certainly could not attribute the original negligence of the owner of the car as the proximate cause of his injury.

*Id*. at 761; *accord Freese v. Norfolk S. Ry. Co*., No. 1:00CV-0108, 2000 WL 33347653 at *8 (N.D. Ind. Sept. 19, 2000) ("If, as Freese asserts, defects should have been corrected before the cars went to him, then what was Freese's job?"); *Wood v. S. Pac. Co*., 337 P.2d 779, 782 (Or.

1959) ("It has frequently been held that the obligation of a carrier to an employee charged with the responsibility of inspecting or making repairs to a defective car does not include that of advising him of the exact condition of the car or furnishing him with a car free from defects and equipped with appliances in good order."); *Bauer v. Great N. Ry. Co*., 150 N.W. 394, 396 (Minn. 1915) ("If it was his duty to repair, then there was no negligence on the part of defendant in furnishing it to him in a defective condition, for, had it not been defective, it would not have reached plaintiff's department for the service.").

Similarly, in *Conway*, a conductor was helping a passenger when the passenger dropped a suitcase and injured the conductor. 720 F.2d at 223. The court explained that handling luggage was simply "part of the work" and thus the plaintiff-conductor could not show negligence on the part of the railroad. *Id.* (internal citations omitted)). In *Potrykus v. CSX Transportation, Inc.*, the plaintiff claimed he suffered cumulative trauma to his knees in the course and scope of his employment as a carman which required him to "stoop/bend/kneel/crouch/crawl" and work in "cramped confined, enclosed or awkward places." 2010 WL 2898782, *4 (N.D. Ohio July 21, 2010). The court held:

> To the extent that the plaintiff alleges the cumulative trauma he suffered was due to these tasks, they are merely "part of the work." Defendant's motion for summary judgment on the grounds that plaintiff has failed to produce evidence that it was negligent for defendant to require plaintiff to perform his tasks as a carman is therefore granted.

*Id.* at * 5 (internal citation omitted).

This Court should reach the same result. Hernandez is a trackman and his job involved making repairs to defective track components. Hernandez cannot recover simply because of conditions encountered as part of his job requirements. *Gottshall*, 512 U.S. at 543, 114 S.Ct. 2396 ("FELA does not make the employer the insurer of the safety of [its] employees while they

are on duty.  The basis of [its] liability is negligence, not the fact that injuries occur."); *Potrykus* , 2010 WL 2898782, *4 (citing *Stevens v. Bangor & Aroostook Ry. Co*., 97 F.3d 595, 598 (1st Cir. 1996) ("[t]he employer's duty to maintain a safe workplace does not require all dangers to be eradicated, but it does demand the elimination of those that can be reasonably avoided *in light of the normal requirements* of the job." (emphasis supplied))).

## F.   Hernandez Cannot Establish Foreseeability−an Essential Element of his FELA Claim.

For an FELA plaintiff to recover for any injury caused by some defect in the work, premises, or equipment, he must first demonstrate the defendant had actual or constructive knowledge of that defect prior to the injury and time to correct the situation.   Reasonable foreseeability of harm is "an essential ingredient of [FELA] negligence."   *CSX Transp., Inc. v. McBride*, 131 S. Ct. 2630, 2643 (2011); *see e.g. Basinger v. CSX Transp., Inc.* 1996 WL 400182, * 5 (6th Cir. 1996), *cert. denied*, 519 U.S. 1111 (1997) ("[Plaintiff] failed to come forward with any evidence to create an issue of fact on the notice issue.  On this basis alone, the district court was correct to grant summary judgment to CSX, since FELA plaintiffs must prove that the railroad had actual or constructive notice, or that they could have or should have known, of the allegedly defective workplace condition in order to state a claim."); *Smith v. Consol. Rail C*orp., 91 F.3d 144 (6th Cir. 1996) (same).

In this case, Hernandez cannot sustain his burden on the notice issue.  Hernandez admits that throughout his career with BNSF he had used a sledgehammer without incident to, among other things, change out rail joint bars.  He further admits that the sledgehammer was a safe and suitable tool to complete the task, he used the sledgehammer in a safe and proper method, he does not criticize the method used to complete the task and was not initially aware that he had injured himself.  Moreover, Hernandez never complained to any supervisor until *after* the alleged

22

incident.   As recognized by the Sixth Circuit:   "[u]nless the complaints were directed to supervisory employees whose knowledge could be imputed to CSX . . . , CSX cannot be charged with knowledge of the alleged defects."   *Basinger*, 1196 WL 400182, at \*5.   The record here is devoid of any such complaints to BNSF supervisors about any aspect of Hernandez's his job.   In fact, the record clearly states that Hernandez did not complain to his supervisors−or anyone else (prior to the alleged incident) that any aspect of his job was unsafe, the work method was unsafe, and/or was causing injury.   As such, there is no proof before this Court of notice of any unreasonably unsafe workplace condition.   Absent that notice, Hernandez has failed to proof BNSF could not have foreseen Hernandez's injury.

## G.    Asking an Employee to Perform a Reasonably Safe Task is Not Negligence.

Finally, BNSF has presented uncontested biomechanical proof that using a sledgehammer to remove rail joints does not create an undue risk of back injuries. (Ex. G).   As a matter of law, asking an employee to perform their job duties in a reasonably safe manner is not negligence.

> It is black letter law that an FELA plaintiff is not entitled to absolute security; the act, unlike workmen's compensation statutes, does not make the employer an insurer.   It "does not contemplate absolute elimination of all dangers, but only the elimination of those dangers which could be removed by reasonable care on the part of the employer.   Reasonable care must mean reasonable in light of the normal requirements of the job.   A yardman dealing with moving cars cannot expect the same safety as a clerical worker in a ticket office.

*Conway*, 720 F.2d at 223; *see Parson v. CSX Transp., Inc.,* 714 F.Supp.2d 839, 843–44 (N.D. Ohio 2010) (noting that a railroad is not under a duty to eliminate all risks and the plaintiff could not recover simply by showing that walking in the yard on inherently uneven surfaces or climbing on and off equipment—tasks that were "merely 'part of the work'"—caused her injury; rather, the plaintiff needed to show that the conditions she faced were *unreasonably unsafe*); *Tootle,* 746 F. Supp.2d at 1338 (finding that the plaintiff's "testimony as to the physical demands of her position is only a description of her job and is not evidence that she [was] required to

perform her job in an unsafe manner"); *Zarecki v. Nat'l Passenger R.R. Corp.,* 914 F. Supp. 1566, 1572 (N.D. Ill.1996) (concluding plaintiff's description of her work activities was not sufficient, by itself, to establish that those activities were unsafe).

Hernandez cannot recover simply by showing he his injury is in some way related to his job.   Instead of setting forth evidence of negligence, Hernandez's testimony describes the physical demands of performing the job he was hired to do.   BNSF is not responsible for injuries caused by the performance of normal job duties.   To find otherwise, would improperly convert this case into a workers' compensation case without regard to fault.

## V.   CONCLUSION

"'When the evidence [in a case] is such that . . . there can be but one reasonable conclusion as to the verdict,' a court should not submit the case to a jury, but should grant summary judgment."   *McKennon*, at 1028 (quoting *Brady*, 320 U.S. 476).   Based on the undisputed facts, there can be only one reasonable conclusion in this case.   BNSF did not foresee any risk of injury to Hernandez from the task he claims he was safely performing.   BNSF was not negligent in allowing its employee to use a sledgehammer to strike a rail joint in an attempt to loosen it.   Hernandez has failed to provide even a scintilla of evidence that BNSF's work method was unreasonably unsafe.   Hernandez's theory that the job could have been accomplished in another manner is of no legal significance since he cannot establish that the method employed was unsafe.   Hernandez's alleged injury, although unfortunate, was not caused by BNSF's negligence and summary judgment should be granted.

WHEREFORE, PREMISES CONSIDERED, Defendant BNSF Railway Company requests that its motion for final summary judgment be granted. Alternatively, to the extent this Court concludes that BNSF has not established it is entitled to summary judgment as to all of Hernandez's allegations, BNSF requests that partial summary judgment be granted.

24

Respectfully submitted this 18th day of February, 2014.

Respectfully submitted,

  /s/ Jeffrey J. Wolf
Jeffrey J. Wolf (Lead Counsel)
Texas Bar No. 21849012
jwolf@wolflawpc.com
Lauren M. Lockett
Texas Bar No. 24013886
llockett@wolflawpc.com
THE WOLF LAW FIRM, P.C.
1360 N. White Chapel Blvd.
Southlake, Texas  76092
(817) 552-9653
(817) 552-0300 (fax)
        *And*
Andrew Evans (Local Counsel)
Texas Bar No. 00796519
andrew.evans@sprouselaw.com
SPROUSE SHRADER SMITH, P.C.
Amarillo Office
701 S. Taylor St., Suite 500
Amarillo, TX 79101
(806) 468.3340
(806) 373-3454 (fax)
**ATTORNEYS FOR DEFENDANT
BNSF RAILWAY COMPANY**

## I.    CERTIFICATE OF SERVICE

I hereby certify that on the February 18, 2014, I electronically filed the foregoing document with the Clerk of the Court for the U.S. District Court, Northern District of Texas, using the electronic case filing system of the Court.  The electronic case filing system sent a "Notice of Electronic Filing" to the following attorneys of record who have consented in writing to accept this Notice as service of this document by electronic means:

W. T. Womble
Will Womble
THE WOMBLE LAW FIRM
1814 Memorial Drive
Houston, Texas  77007
***Counsel for Plaintiff Keith Hernandez***

Joe L. Lovell
LOVELL LOVELL NEWSOM & ISERN
112 West 8th Ave; Ste 1000
Amarillo, TX 79101-2314

/s/ Jeffrey J. Wolf
Jeffrey J. Wolf