<u>SUMMARY</u>

This is a suit brought by a railroad employee pursuant to the Federal Employers' Liability Act (FELA).  45 U.S.C. §51, *et. seq.*

On July 2, 2012, plaintiff Keith Hernandez was working as a trackman assigned to BNSF foreman John Rusler's track crew.  The crew was responsible for repair and maintenance of BNSF's railroad tracks located in the Amarillo yard.   They normally worked from 7:00 a.m. to 3:30 p.m.  After finishing the repair of a guardrail at 2:30, John Rusler instructed his crew to replace a metal joint bar.  He thought the job would take 30 minutes and would be completed before incurring overtime.  He was wrong.

Joint bars consist of metal bars that connect two adjoining rails with bolts and nuts. Before any work began, a visual inspection of the subject joint bar revealed it to be corroded, rusted and frozen to the rail.

Mr. Rusler was negligent by beginning the job when he did and without an adequate plan. Instead of stopping the job, assessing his options, and developing a repair plan to be accomplished when adequate time was available, Mr. Rusler negligently placed his crew at a *point of no return* and *created a rushed work atmosphere* that, under the circumstances, caused Mr. Hernandez's injury.

Due to corrosion and rust, the nuts were difficult to remove from the bolts.  Eventually, Mr. Rusler cut some of the bolts with an acetylene torch.  According to Mr. Rusler, when he cut the bolts he and his crew reached a *point of no return* and had to finish the repair that day so trains could pass over the repair site safely.

It took until 4:00 to remove the bolts.  Then, Mr. Rusler instructed his crew to attempt to knock the joint bar from the railroad track by using a sledgehammer.  Crew member Pete Place

first hit the joint bar four or five times, realized it was not going to budge, and did not strike it again.   Mr. Rusler and Mr. Hernandez then took turns striking the joint bar with the sledgehammer, but it did not budge.

About 4:30, Mr. Hernandez injured his back when the sledgehammer he was swinging suddenly stopped against the immovable joint bar.  He winced, dropped the hammer, walked to the truck, and never swung the hammer again.

Present during this entire time was the backhoe and machine operator that were assigned to Mr. Rusler.  Eventually, Mr. Rusler decided to have the operator use the teeth of the backhoe's bucket to hydraulically peel the bar away from the rail.  That worked.  The crew finished the job by 4:45 and was off duty by 5:00.

During the process of striking the joint bar with the sledgehammer, Mr. Hernandez felt that Mr. Rusler "was rushing us to get done." He felt that Mr. Rusler was overzealous, attempting to earn his stripes, and made Mr. Hernandez feel that he and the crew needed to hurry.  Of course, at that time the crew was well into the overtime Mr. Rusler had hoped to avoid and the track eventually needed to be returned to train service.

Under the circumstances, the incident and injury was foreseeable to BNSF's foreman and, thus, foreseeable to BNSF.  When he learned Mr. Hernandez had reported an injury, Mr. Rusler admitted that he "thought he [Mr. Hernandez] may have gotten tired, may have strained his back"  Mr. Hernandez was performing "the type work, based on [Mr. Rusler's] judgment and experience that could have caused a back strain."

On July 2, 2012, Mr. Rusler was a BNSF supervisor working within the scope of his employment in furtherance of BNSF's business.  He was knowledgeable of the conditions of the workplace in question, he created the unsafe rushed work atmosphere and he chose and directed

the method of work and tools to be used.  Thus, BNSF is vicariously liable for Mr. Rusler's negligence based on the doctrine of *respondeat superior*.

Plaintiff's summary judgment evidence establishes that, under the circumstances present at the time of Mr. Hernandez's injury, BNSF negligently failed to provide Mr. Hernandez with a reasonably safe place to work and with a reasonably safe supervisor.  The negligence of BNSF's agent, employee and foreman, John Rusler, caused, in whole or in part, no matter how slight, the foreseeable incident and injuries sustained by Mr. Hernandez in at least the following manners, each of which establish the presence of genuine issues of material fact.

1. Mr. Rusler forced an unnecessary work task upon his crew by torching the joint bar bolts late in the work day, creating a point of no return and a rushed work atmosphere.

2. While he felt rushed by Mr. Rusler, Mr. Hernandez repeatedly swung the sledgehammer to a sudden stop against the immovable steel joint bar.

3. Mr. Rusler failed to timely recognize that the joint bar was stuck to the railroad track to such a degree that it could not be removed by striking it with a sledgehammer.

4. Mr. Rusler failed to stop and assess the task before reaching a point of no return.

5. Mr. Rusler failed to timely use the backhoe to remove the joint bar.  The backhoe was available and its eventual use proved to be a reasonably safe alternative work method/tool.

Plaintiff's summary judgment evidence establishes that a rushed work atmosphere was fostered by Mr. Hernandez's supervisor.  This constitutes evidence of negligence and, under the applicable law, is sufficient to withstand a motion for summary judgment.

Evidence of the availability of alternative reasonably safe work methods or tools is relevant to the inquiry of a railroad's negligence.  Juries in a FELA suit are permitted to consider evidence of alternative work methods and work practices when determining whether a railroad was negligent by failing to provide its employees with a reasonably safe place to work.

EVIDENCE RELIED UPON

Plaintiff relies on the pleadings and summary judgment evidence in the Appendix:

Exhibit A:     Deposition excerpts of Keith Hernandez.

Exhibit B:     Deposition excerpts of John Rusler.

Exhibit C:     Deposition excerpts of Pete Place.

Exhibit D:     Deposition excerpts of Jeffrey Soukup.

Exhibit E:     Deposition excerpts of Bret Errington, M.D.

Exhibit F:     Deposition Exhibit 9 (photographs of exemplar joint bars and railroad tracks).

Exhibit G:     Deposition Exhibit 13 (sketch of cross-section of rail with joint bar and bolts).

Exhibit H:     Deposition Exhibit 12 (July 2, 2012 hourly timeline prepared by John Rusler).

Exhibit I:      Deposition Exhibit 3 (Personal Injury/Occupational Illness Report (July 3, 2012).

Exhibit J:      Deposition Exhibit 10 (photographs of exemplar backhoes and bucket).

<u>PLAINTIFF'S SUMMARY JUDGMENT EVIDENCE OF UNDISPUTED FACTS</u>

1. On July 2, 2012, Keith Hernandez went to work at 7:00 a.m.[1] and that morning worked in the south portion of BNSF's Amarillo yard.[2]  After lunch, he was assigned to assist BNSF foreman John Rusler's crew in the Amarillo north yard.[3]  That afternoon, John Rusler's crew first repaired a guardrail.[4]  This repair was completed by about 2:30 p.m., which was about an hour before the crew's normal 3:30 p.m. quitting time.[5]

2. After repairing the guardrail, Mr. Rusler assigned his crew the job of replacing a metal joint bar that connected the ends of two rails of railroad track.[6]  The joint bars were bolted to the ends of each abutting rail.[7]  Mr. Rusler anticipated that changing out the bars would be a simple task that should not have taken thirty minutes,[8] but the job was not as simple as Mr. Rusler anticipated.[9]

3. Rusler had planned this job so it would be completed before quitting time and so no overtime would be incurred.[10]  But, because difficulties were encountered, Mr. Rusler's plan did not work. The crew began the job of replacing joint bars at 2:30 p.m. and finally finished it at 4:45 p.m.;[11] so, a job that was originally planned to take thirty minutes, actually took more than two hours to complete and, indeed, overtime was incurred.[12]   First, the nuts and bolts were rusted and some of the bolts had to be cut with a cutting torch.[13]  Once Mr. Rusler torched the bolts he thought he

---

[1] Appendix A, p. 005 (Hernandez depo. 38/5-7).
[2] Appendix A, p. 005 (Hernandez depo. 40/3-12).
[3] Appendix A, p. 006 (Hernandez depo. 48/3-9).
[4] Appendix A, p. 006 (Hernandez depo. 48/3-21); Appendix A, p. 007 (Hernandez depo. 59/16 – 60/7).
[5] Appendix B, p. 017 (Rusler depo. 9/21-22).
[6] Appendix A, p. 007-008 (Hernandez depo. 61/19 – 62/1).
[7] Appendix F, p. 048 (Depo. Exh. 9, photographs of exemplar joint bars bolted to railroad tracks); and Appendix G, p. 050 (Depo. Exh. 13, sketch of cross-section of rail with joint bar and bolts).
[8] Appendix B, p. 017 (Rusler depo. 9/3-20).
[9] Appendix B, p. 017 (Rusler depo. 9/11-13).
[10] Appendix B, p. 017 (Rusler depo. 9/14-22).
[11] Appendix B, p. 022 (Rusler depo. 28/19 – 29/11).
[12] Appendix H, p. 052 (Depo. Exh. 12, hourly timeline prepared by Rusler).
[13] Appendix B, p. 020 (Rusler depo. 18/12-18).

had reached a *point of no return*[14] because the track was reserved and protected for his crew and eventually had to be returned to train service.[15]  It was 4:00 p.m. before the bolts were loose and ready to come out.[16]  Second, even before the bolts were removed, it was discovered that the joint bar was firmly rusted, corroded and frozen to the railroad track.[17]

4. After torching the bolts, Mr. Rusler had the option of reinserting replacement bolts, ending work that day and returning another day to complete the task, but he did not do that.[18]  At that point, Mr. Rusler's crew was already into overtime.[19]  By the time the crew removed the bolts, Mr. Rusler realized the bar would not be removed by striking it with the sledgehammer.[20]

5. At that point, Mr. Rusler could have replaced the bolts, ended the day, and returned another day with a different plan;[21] or, he could have cut the rails on either side of the joint bar and replaced that portion of the rail;[22] or, he could have used the backhoe's bucket[23] at that point in time.[24]

6. Instead, Mr. Rusler had his crew continue to beat on the joint bar with a sledgehammer in an attempt to dislodge it from the rail, even though the bar was immovable and unresponsive to repeated impact blows.[25]  Pete Place struck the bar with the sledgehammer four or five times[26] and realized, "it ain't happening," "I give up" [meaning the bar was not going to part from the rail by striking it with the sledgehammer].[27]  Mr. Rusler and Mr. Hernandez struck the joint bar

---

[14] Appendix B, p. 023 (Rusler depo. 34/15 – 35/20); and, Appendix B, p. 025 (Rusler depo. 44/6-25); and Appendix A, p. 014 (Hernandez depo. 114/21 – 115/6).
[15] Appendix A, p. 013 (Hernandez depo. 112/22 – 113/16); and, Appendix B, p. 019 (Rusler depo. 14/20 – 16/11).
[16] Appendix B, p. 020-021 (Rusler depo. 21/18 – 22/5).
[17] Appendix C, p. 035 (Place depo. 55/13 – 56/8).
[18] Appendix B, p. 028-029 (Rusler depo. 56/19 – 58/12).
[19] Appendix B, p. 028 (Rusler depo. 57/15-19).
[20] Appendix B, p. 028 (Rusler depo. 56/14-18); and Appendix B, p. 028 (Rusler depo. 57/20-21).
[21] Appendix B, p. 028-029 (Rusler depo. 57/23 – 58/12).
[22] Appendix B, p. 029 (Rusler depo. 58/13 – 60/4).
[23] Appendix J, p. 056 (photograph of exemplar backhoes and bucket).
[24] Appendix B, p. 030 (Rusler depo. 67/17 – 68/2).
**[25]** Appendix B, p. 028 (Rusler depo. 56/14 -57/22).
[26] Appendix C, p. 038 (Place depo. 86/12 – 88/6).
[27] Appendix C, p. 033 (Place depo.30/16 – 31/7).

repeatedly with the sledgehammer and both became tired while doing so; the backhoe and its operator were there all that time.[28]  Mr. Hernandez was injured around 4:30.[29]

7.  Mr. Rusler extended the task beyond what he called the *point of no return*[30]

8.  During the time he was attempting to dislodge the bar by swinging the sledgehammer against it, Mr. Hernandez "felt rushed"[31] by Mr. Rusler.  "He'd rush people.  He would attempt to do more than what was asked of him to do."[32]  Mr. Rusler "was rushing us to get done;"[33]  To Mr. Hernandez, it appeared that Mr. Rusler was "overzealous,"[34] like he was "attempting to earn his stripes."[35]  He "made it feel we needed to hurry."  "Rushing" us.[36]

9.  The backhoe and its operator were present during the entire time Mr. Rusler's crew attempted to remove the joint bar.[37]

10.  The bar remained stuck to the railroad track until Mr. Rusler changed the method of removing the bar by accepting the backhoe operator's suggestion to engage the bar with the teeth of a backhoe's bucket so the bar could be hydraulically and mechanically peeled away from the rail.[38]

11.  Because the hydraulics of the backhoe was stronger than the men, the operator hydraulically and mechanically tilted the backhoe bucket and popped the bar off.[39]

12.  After that alternative work method proved successful,[40] the crew then bolted the replacement bar to the rail, finished their work by 4:45 and went off duty at 5:00.[41]

---

[28] Appendix B, p. 030 (Rusler depo. 66/11 – 68/2).
[29] Appendix A, p. 012 (Hernandez depo.106/11-12).
[30] Appendix B, p. 023 (Rusler depo.34/15 – 35/11); and Appendix B, p. 025 (Rusler depo. 44/6-25).  Emphasis supplied.
[31] Appendix A, p. 013 (Hernandez depo. 112/22 – 113/16).
[32] Appendix A, p. 003 (Hernandez depo. 27/3-13).
[33] Appendix A, p. 013-014 (Hernandez depo. 112/22 – 114/1).
[34] Appendix A, p. 003 (Hernandez depo. 26/24 – 27/4).
[35] Appendix A, p. 006 (Hernandez depo. 46/20-25).
[36] Appendix A, p. 013-014 (Hernandez depo. 113/14 – 114/1).
[37] Appendix B, p. 017-018 (Rusler depo. 9/23 – 10/6); Appendix B, p. 030 (Rusler depo. 67/17 – 68/2).
[38] Appendix B, p. 030 (Rusler depo. 67/17 – 68/13).
[39] Appendix B, p. 030 (Rusler depo. 69/3-12).

13. Mr. Hernandez winced when he injured his back by hitting the immovable bar with the sledgehammer, walked to the truck and never swung the sledgehammer again.[42]

14. Mr. Hernandez did not report his injury at the time it occurred because he had been told by BNSF to "make sure you're injured before you report anything."[43]  When he could barely get out of bed the next morning, he called his Roadmaster, reported that he had injured his back at work the previous day,[44] and went to the doctor.[45]

15. The Roadmaster met Mr. Hernandez at the doctor's office and that is where Mr. Hernandez completed BNSF's accident report, stating he had injured his back the previous day "while trying to hit the insulated joints off with a 12-pound hammer."[46]

16. When Mr. Rusler learned of Mr. Hernandez's reported injury, Mr. Rusler "thought he [Hernandez] may have gotten tired, may have strained his back."[47] Mr. Rusler testified that, based on his judgment and experience, the type work Mr. Hernandez was performing on July 2, 2012, "could have caused him back strain."[48]

17. According to neurosurgeon Bret Errington, M.D., within reasonable medical probability, the injury and pain Mr. Hernandez reported was caused by his swinging the sledgehammer on July 2, 2012, especially when the hammer's sudden stop against the immovable bar is taken into consideration.[49]

---

[40] Appendix B, p. 030 (Rusler depo. 68/7 - 69/12) Appendix A, p. 009 (Hernandez depo. 80/19-21); and Appendix C, p. 036 (Place depo. 62/3-25).
[41] Appendix A, p. 005 (Hernandez depo. 38/5-13); Appendix B, p. 022 (Rusler depo. 29/6-11); and Appendix C, p. 037 (Place depo. 67/24 – 68/9).
[42] Appendix A, p. 010 (Hernandez depo. 82/7 – 83/15).
[43] Appendix A, p. 010-011 (Hernandez depo. 84/17 – 86/2).
[44] *Id.*
[45] Appendix A, p. 010-011 (Hernandez depo. 84/16 – 87/10); Appendix D, p. 041 (Soukup depo. 18/15 – 19/3); and Appendix I, p. 054 (Hernandez's Personal Injury/Occupational Illness Report, dated July 3, 2012)
[46] Appendix A, p. 011 (Hernandez depo. 86/6 – 87/5); and, Appendix I, p. 054 (Hernandez's Personal Injury/Occupational Illness Report, dated July 3, 2012).
[47] Appendix B, p. 026-027 (Rusler depo. 49/14 – 50/1).
[48] *Id.*
[49] Appendix E, p. 044-045 (Errington depo. 51/24 – 54/22; and Appendix E, p. 046 (Errington depo. 58/ 7 – 60/2).

18. Mr. Hernandez asked Mr. Rusler why the crew was changing the joint bars and was told, "It's got to get done." Mr. Hernandez did not want to push the issue and just did what he was told to do because he did not want to be insubordinate.[50]

19. Although Mr. Rusler said he has "no personal experience one way or the other with anybody invoking empowerment with [him] or with [him] invoking empowerment with someone else,"[51] Mr. Rusler testified that ". . . *there's a fine line between empowerment and insubordination*," and that a BNSF employee being insubordinate can lead to his termination"[52]

20. Mr. Rusler defined the difference between being insubordinate and BNSF's empowerment concept by stating:

> Q.  Okay. So, describe the fine line between insubordination and empowerment."
>
> A.  Empowerment is something that – whenever you do feel that it's unsafe and then you have the officers come out there and it is determined that the way that you were doing it was unsafe, then they find another way to do it safe.
>
> And, then there's the part where just because I feel that this – I don't want to do this job, it's a stupid job, and I choose to empower myself, and they can't prove that what you were doing was unsafe.  And so that's my – that's what I feel is the difference.[53]

21. On and before July 2, 2012, Mr. Rusler observed Mr. Hernandez to be a good, pleasant worker, and one who safely did the work assigned to him, was one who knew how to work and was physically able to perform the duties of a BNSF trackman.[54]

---

[50] Appendix A, p. 011 (Hernandez depo. 89/12-23).
[51] Appendix B, p. 026 (Rusler depo. 46/6-12), and Appendix B, p. 026 (Rusler depo. 47/12-18).
[52] Appendix B, p. 026 (Rusler depo. 46/16-24).
[53] Appendix B, p. 026 (Rusler depo. 46/25 – 47/11).
[54] Appendix B, p. 026 (Rusler depo. 48/1 – 49/8).

ARGUMENT & AUTHORITIES

A. FELA – Summary Judgment Standard

Keith Hernandez filed this suit pursuant to the Federal Employers' Liability Act (FELA).[55] The FELA was enacted by Congress more than a century ago to provide a means of redress for injured railroad workers.[56]

The evidence required to establish liability in a FELA action is less than that required in an ordinary negligence action.[57]  Because the common law standard of proximate cause is not applicable to FELA,[58] all that is required of a FELA plaintiff is to demonstrate that his employer's negligence played any part, even the slightest, in producing his injury.[59]

 "FELA cases may be withdrawn from a jury's consideration 'only in those extremely rare instances where there is zero probability either of employer negligence or that any such negligence contributed to the injury of the employee."[60]

While a genuine issue of material fact exists only if "a fair-minded jury could return a verdict for [the non-moving party] on the evidence presented,"[61] "[t]he reviewing court must

---

[55] "Under FELA, 'Every common carrier by railroad . . . shall be liable in damages to any person suffering injury while he is employed by such carrier . . . for such injury . . . resulting in whole or in part from the negligence of any of the officers, agents, or employees of such carrier. . . .'" 45 U.S.C. §51, *et. seq.*

[56] "FELA's enactment stemmed from the belief that 'justice demands that one who gives his labor to the furtherance of the [railroad] enterprise should be assured that all combining their exertions with him in the common pursuit will conduct themselves in all respects with sufficient care that his safety while doing his part will not be endangered.'" *Gibbs v. Union Pac. R.R. Co.,* 2009 U.S. Dist. LEXIS 70251, *8, 2009 WL 3064956, citing, *Stinkler v. Mo. Pac. R.R. Co.,* 356 U.S. 326, 330, 78 S.Ct. 758, 2 L.Ed.2d 799 (1958).

[57] Harbin v. Burlington N. R.R. Co., 921 F.2d 129, 131-32 (7th Cir. 1990).

[58] Crane v. Cedar Rapids & Iowa R.R. Co., 395 U.S. 164, 166, 23 L. Ed. 2d 176, 89 S. Ct. 1706 (1969).

[59] Rogers v. Missouri Pac. R.R. Co., 352 U.S. 500, 506, 1 L. Ed. 2d 493, 77 S. Ct. 443 (1957).

[60] *Fitzgerald v. Buffalo & Pittsburgh R.R.,* 2011 U.S. Dist. LEXIS 85685, *19, 2011 WL 3163241, citing *Pehowic v. Erie Lackawanna R.R. Co., 430 F.2d 697, 699 (3d Cir. 1970).*

[61] *Gibbs v. Union Pac. R.R. Co.,* 2009 U.S. Dist. LEXIS 70251, *8, 2009 WL 3064956, at *4, citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed. 2d 202 (1986).

construe the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in favor of that party."[62]

While it has been stated in various ways, the following language succinctly sums up this summary judgment standard:

> Summary Judgment disposition is inappropriate if the evidence before the court, viewed as a whole, could lead to different factual findings and conclusions" after the court resolves "all factual uncertainties and mak[es] all reasonable inferences in favor of the nonmoving party.[63]

Because the FELA is meant to offer broad remedial relief to railroad workers a Plaintiff's burden when suing under the FELA is lighter than in an ordinary negligence case.[64]  "With respect to [FELA] causation, "the test of a jury case is simply whether the proofs justify with reason the conclusion that employer negligence played any part, even in the slightest, in producing the injury or death for which damages are sought.'"[65]

**B.**  FELA – BNSF's Non-Delegable FELA Duty to Provide Plaintiff with a Reasonably Safe Place to Work and BNSF's Vicarious Liability

The FELA is a remedial safety statute that imposes on railroad carriers such as the BNSF the continuing *non-delegable* duty of providing its employees with a reasonably safe place to work.[66]  Here, all Mr. Hernandez needs to prove is that BNSF, acting through its agent or employee (foreman John Rusler) breached this well-established duty.  This duty included

---

[62] *Id.*
[63] *Honore v. Douglas,* 833 F.2d 565, 567 (5th Cir. 1987).
[64] *McBride v. CSX Transportation, Inc.,* 131 S.Ct. 2630, 180 L.Ed. 2d 637 (2011).
[65] *Fitzgerald, id.,* citing *Rogers v. Missouri Pac. R.R. Co.,* 353 U.S. 500, 506 77 S.Ct. 443, 1 L.Ed. 493 (1957).
[66] *Shenker v. Baltimore & Ohio R.R.*, 374 U.S. 1, 6-8 (1963); *Bailey v. Central Vermont Ry.*, 319 U.S. 350, 352-3 (1943).

providing Mr. Hernandez with a reasonably safe supervisor, as well as the *duty* to use reasonable care to establish and enforce reasonably safe work procedures.[67]

As stated above, the evidence required to establish liability in a FELA action is less than that required in an ordinary negligence action.[68] For example, the common law standard of proximate cause is not applicable to FELA.[69]

It is clear that at all times material to the issues in this suit, Mr. Rusler was acting within the scope of his employment.  Thus, BNSF is vicariously liable for Mr. Rusler's negligence based on the doctrine of *respondeat superior*.  The following language from the Fifth Circuit in *Beech v. Hercules Drilling Co., L.L.C.*[70] is instructive:

> One of those common law principles that still carries "great weight" in the FELA and Jones Act context is that an employer may be vicariously liable for its employee's negligence under the doctrine of *respondeat superior* so long as the negligence occurred "in the course of employment." *See, e.g., Landry v. Oceanic Contractors, Inc.,* 731 F.2d 299, 303 (5th Cir.1984); *Sobieski v. Ispat Island, Inc.,* 413 F.3d 628, 632 (7th Cir.2005) ("[V]icarious liability may extend to FELA or Jones Act employers under the traditional doctrine of *respondeat superior*. Well-established precedent applies the common law principle that an employer may be vicariously liable for its employee's negligence (or intentional tort) committed within the course or scope of employment—that is, committed while furthering the employer's (or the ship's) business.") (citations omitted).

## C.  BNSF's Negligence

BNSF is responsible for its foreman's negligent conduct.

There is no reason the task of replacing the joint bar had to be accomplished on July 2, 2012.[71]  Mr. Rusler could and should have stopped the job, replaced the bolts, reflected and

---

[67] *Ybarra v. Burlington Northern R.R.*, 689 F. 2d 147, 150 (8th Cir. 1982).

[68] *Harbin v. Burlington N. R.R. Co.*, 921 F.2d 129, 131-32 (7th Cir. 1990).

[69] *Crane v. Cedar Rapids & Iowa R.R. Co.*, 395 U.S. 164, 166, 23 L. Ed. 2d 176, 89 S. Ct. 1706 (1969); *Mitchell v. MKT*, 786 S.W.2d 659, 661 (Tex. 1990).

[70] *Beech v. Hercules Drilling Co., L.L.C.*, 691 F.3d 566, 571 (5th Cir.2012).

[71] Appendix C, p. 031 (Place depo. page 38, lines 8-25).

developed a plan with calm deliberation, and finished the job with the next day or on another day,[72] as a reasonable and prudent foreman would have done under the same or similar circumstances.

Once BNSF's foreman torched the bolts, he negligently created a *point of no return* and a *rushed work atmosphere*. Mr. Rusler's negligence was a cause, in whole or in part, no matter how slight, of the incident in question and Mr. Hernandez's injury.

<u>John Rusler</u>

Q.      Did anyone say why are we doing this at 2:30 when we're supposed to get off at 3:30, when y'all got to the job site?

A.      I don't know at that time.  Maybe once we got into it, it might have been brought up.  But you know, once it –

Q.      Who brought – who brought it up?  Don't remember?

A.      *I may have brought it up*, you know.  But it's one of those, yeah, you can question it, *but I'm still going to do the job*.  And then once you get to the one point, there's that's the thing about railroad work.  There's a point where you either stop before you get to that point or you – once you pass that point, *it's a point of no return* that you've got to finish the job and do what it takes to finish the job.
        And, you know, once we started knocking those – *once we torched that first bolt and whenever we had the issues with the bolts coming out, you know, it was to the point of –*[73]

***

Q.      And once you start a job, you want to make sure it's finished –

A.      Yes, sir.

Q.      -- is that right, no matter what?

A.      To a point.

---

[72]  Appendix B, p. 025-026 (Rusler depo. 44/6 – 46/24).
[73]  Appendix B, p. 023 (Rusler depo. 34/15 – 35/11; and, Appendix B, p. 025 (Rusler depo. 44/6-25).  Emphasis supplied.

Q.      Okay.

A.      I mean, there's a point where *you either finish the job or you stop, reflect and start over* with a different job, redoing the job.[74]

Because of Mr. Rusler's negligence, a simple thirty minute job became a troublesome one that was fraught with problems and not as easy as Mr. Rusler anticipated.[75]   This was especially so once, as Mr. Rusler testified, he reached a *point of no return* by torching off the joint bar's rusted nuts and bolts.  It then took until 4:00 to finish removing the nuts and bolts.

An already rushed work atmosphere intensified because before his crew could leave for the day the foreman had to return the track to service so trains could safely pass over the track at the repair point.  That could only be accomplished by either replacing the torched bolts and ending the day at that point, or finishing the task of removing and replacing the joint bar.  Mr. Rusler chose the latter.

Mr. Rusler was negligent in the creation of a rushed work atmosphere and such negligence was a cause, in whole or in part, no matter how slight, of the incident in question and Mr. Hernandez's injury.

The rushed atmosphere was exacerbated by the joint bar being corroded, rusted and frozen to the rail.  At 4:00 p.m. the foreman had his crew attempt the clearly impossible task of removing the rusted joint bar by repeatedly striking it with a sledgehammer.  After realizing the bar would not budge from repeated sledgehammer blows, Mr. Rusler finally engaged an alternate work method that proved successful.

If the foreman had used the backhoe-loader's bucket to peel the bar away from the rail when it first became apparent the bar was stuck to the rail, the rushed and hurried work

---

[74] Appendix B, p. 025 (Rusler depo. 44/6-14).  Emphasis supplied.
[75] Appendix B, p. 017 (Rusler depo. 9/3-13).

atmosphere could have been avoided and there would have been no need for Mr. Hernandez or any crew member to repeatedly experience the sledgehammer's sudden stop against the immovable steel joint rail.  And, Mr. Hernandez's injury would have been avoided.

BNSF is not entitled to summary judgment on Mr. Hernandez's FELA claim.  In a suit involving similar circumstances a trial court's granting of a FELA summary judgment was reversed.  In *Gibbs v. Union Pac. R.R. Co.* the plaintiff railroad employee alleged he was injured when he may have exceeded his lift limits in an effort to expedite his work due to a *rushed work atmosphere* at the railroad's work project, even though he did not object to the rushed circumstances.  The reviewing court's statement is instructive and persuasive:

> As a preliminary matter, the Court notes that, while Gibbs' first claim might not survive a motion for summary judgment in the traditional tort context, the low negligence threshold of FELA ensures that this count will live to see another day.[76]
>
> ***
>
> Genuine issues of material fact exist as to whether the rushed work atmosphere and Union Pacific's failure to supply Gibbs with a back brace constituted an unsafe work environment.  If a foreseeably unsafe work site is found to have caused Gibbs' injury, he will be entitled to recover.  The current facts and inferences, taken as a whole in Gibbs' favor, illustrate the evidentiary scintilla of negligence that is required in FELA claims.  Accordingly, *Union Pacific is not entitled to summary judgment on this claim.*[77]

Similarly, the Union Pacific Railroad was denied summary judgment when an employee alleged the railroad breached its duty to provide him with a safe place to work when his

> ". . . foreman rushed him to complete the shoveling job because it was near quitting time . . . .  Given the rushed circumstances, the refusal of the foreman to consider alternative means to complete the task . . . it is not difficult to imagine that *the potential for a foreseeably unsafe workplace arose* . . . .  Moreover, an inference exists that Union Pacific had constructive knowledge that an unsafe condition existed – particularly near the end of a shift – where an employee was pressured to hurry if shoveling was necessary to complete a task.  The Court

---

[76] *Gibbs,* 2009 U.S. Dist LEXIS 87561, *8; 2009 WL 30649562009.
[77] *Id, at *12.*  Emphasis supplied.

acknowledges that this inference rests on a weak reed, but *it is sufficient to withstand a motion for summary judgment in a FELA case*"[78]

While it is true that a railroad is not necessarily required to furnish its employees with the latest, best or most perfect appliances with which to work, "this does not mean that the availability of alternative, safer tools is irrelevant to the issue of negligence.  The proper inquiry is 'what a reasonable and prudent person would have done under the circumstances.'"[79]

D.  Foreseeability

As in *Gibbs* and *Incaprera,* it was foreseeable that a railroad employee such as Mr. Hernandez can be injured when he is being rushed in his job performance, or even if he feels he is being rushed.  In addition, foreseeability was confirmed by Mr. Rusler when he stated that he "thought he [Hernandez] may have gotten tired, may have strained his back."[80]  Mr. Rusler testified that, based on his judgment and experience, the type work Mr. Hernandez was performing on July 2, 2012, "could have caused him back strain."[81]

BNSF's expert is of the opinion that it was impossible for Mr. Hernandez to be injured striking a joint bar with a sledgehammer.  But, unlike Dr. Errington, she did not consider the impact on the back when Mr. Hernandez swung the sledgehammer to a sudden stop against the joint bar.

According to neurosurgeon Bret Errington, M.D., within reasonable medical probability, the injury and pain Mr. Hernandez reported was caused by his swinging the sledgehammer on

---

[78] *Incaprera v. Union Pac. R.R. Co.,* 2010 U.S. Dist. LEXIS 1221, *8, 2010 WL 98879 (S.D. Ill., 2010), citing *Gibbs,* 2009 U.S. Dist. LEXIS 87561.  Emphasis supplied.

[79] *Fitzgerald v. Buffalo & Pittsburgh R.R.,* 2011 U.S. Dist. LEXIS 85685, *19, 2011 WL 3163241, citing *Stone v. New York, C., & St. L. R. Co.,* 344 U.S. 407 (1953), and distinguishing *Soto v. Southern Pacific Transportation Co.,* 644 F.2d 1147 (5th Cir. 1981) and *McKennon v CSX Transportation Co.,* 827 F. Supp. 1024, 2026-27 (M.D. Tenn. 1995), *aff'd* 56 F.3d 64 (6th Cir. 1995), on the basis there was no negligence evidence in *Soto* or *McKennon.*

[80] Appendix B, p. 024-025 (Rusler depo. page 49, line 14, through page 50, line 1).

[81] *Id.*

July 2, 2012, especially when the hammer's *sudden stop* against the immovable bar is taken into consideration.[82]  Dr. Errington provided the following illustration and opinion.

> Q.  Let me add one more factor that neither Mr. Wolf nor I have told you about. When Mr. Hernandez was swinging the hammer, assume that he was hitting an immovable object.  As a matter of fact, they thought the object would move, but it didn't.  It was like hitting the rail itself.  It was like hitting an anvil that would not move.  And given that added factor, whether he was overexerting himself or not, but hitting an immovable object with a sledgehammer repeatedly, would that be calculated to cause the injury or pain that Mr. Hernandez related to you?  Based upon a reasonable medical probability?
>
> A.  [Dr. Errington] I would say that it -- yes, okay.  If I may explain.  We know from -- there's actually something called a clay-shoveler's fracture.  A clay-shoveler's fracture is a fracture of the seventh neck bone, and that happens when a person is using a shovel.  And you normally are shoveling along, and you get a pile of dirt and you throw it over your shoulder.  If the shovel sticks in clay, then that *sudden stop* can fracture the cervical spine.  So the point being, a sudden deceleration, head injuries happen worse with sudden deceleration.  The energy is therefore increased, so, you know, given that history, I could certainly, you know, theorize that *a patient would have more shock to their body if something were a sudden stop versus -- you know, say, I guess if the spike was being driven and it drove, then that dissipates the injury -- or, excuse me, the energy much more than a sudden stop.*  I mean, that's conjecture and it's theory, but it makes sense based on my experience with other things.
>
> Q.  And the sudden stop would be related to hitting an immovable object?
>
> A.  Right, based upon that history that you just gave me.  Was that by testimony?
>
> Q.  Yes.[83]

As articulated by the U.S. Supreme Court, the Fifth Circuit, and other circuits, a plaintiff proceeding under the FELA engages in a suit which is "substantially different from the ordinary common law negligence action."[84]  Under the FELA, proving the railroad's actual notice of unsafe conditions is unnecessary.  Constructive notice will

---

[82] Appendix E, p. 044-045 (Errington depo. 51/20 – 54/22; and, Appendix E, p. 041 (Errington depo. 58/7 – 60/2).
[83] Appendix E, p. 046 (Errington depo. 58/7 – 60/2).  Emphasis supplied.
[84] *Rogers*, 352 U.S. at 509-510.

suffice.[85]   In a FELA case, a plaintiff is not required to prove foreseeability in order to prove causation because the issue of duty remains one for the Court, and not the jury.[86]

The Texas Supreme Court has repeatedly stated that "foreseeability requires only that the general danger, not the exact sequence of events that produced the harm, be foreseeable."[87] It is not required that the particular accident complained of should have been foreseen. All that is required is that (1) the injury be of such a general character as might reasonably have been anticipated, and that (2) the injured party should be so situated with relation to the wrongful act that injury to him or to one similarly situated might reasonably have been foreseen.[88]

In the context of FELA cases, the FELA requires railroad employers to use "reasonable care in furnishing their employees with a safe place to work."[89] Consequently, the railroad had a non-delegable duty to provide plaintiff with a safe work place where he was injured.[90] A railroad may be liable for failure to provide a safe workplace "when it knows or should know of a potential hazard in the workplace, yet fails to exercise reasonable care to inform and protect its employees."[91]   However, foreseeability does not require proof that a similar incident had already occurred.[92]

In *Gallick v. Baltimore & O R.R.*,[93] the U.S. Supreme Court articulated the proper standard for a railroad to be held to under the FELA as one of "reasonability of harm" or

---

[85] Givens v. St. Louis Southwestern Ry., 425 F.2d 114, 118 (5th Cir. 1970).
[86] *Id.*
[87] *Mellon Mortgage Co. v. Holder*, 5 S.W.3d 654, 655 (Tex. 1999).
[88] *Id.*
[89] *Consolidated Rail Corp. v. Gottshall*, 512 U.S. 532, 550, 114 S. Ct. 2396, 2408, 129 L. Ed. 2d 427 (1994).
[90] *Id.*
[91] *Syverson v. Consolidated Rail Corp.*, 19 F. 3d 824, 826 (2nd Cir. 1994), *quoting, Gallose v. Long Island R.R.*, 878 F. 2d 80, 84-85 (2nd Cir. 1989).
[92] *Gallick v. Baltimore & O R.R,* 372 U.S. at 121, 83 S. Ct. at 668.
[93] *Id,* 372 U.S.at 117-119 (1963).

"reasonable foreseeability of harm" based on what "a reasonably prudent person would anticipate" in light of the surrounding circumstances.[94].

For a defendant railroad to be held liable in an FELA case, *it need not foresee the particular consequences* of its negligent acts.[95] Under the FELA, a defendant must compensate plaintiff even for improbable or unexpectedly severe consequences of defendant's wrongful act. Thus regardless whether the defendant in this suit could have foreseen plaintiff's particular injuries, the fact that the railroad was negligent in exposing plaintiff to an unsafe work environment is enough to satisfy the foreseeability requirement.[96]

The duties that apply to the railroad, including foreseeability, are to be decided by the trial court. The jury can then take on the task of weighing the reasonableness of the railroad's conduct in light of all the evidence, including the actual and constructive knowledge of the railroad.

When considering the testimony and the applicable FELA law, it is clear from the facts in this suit that foreseeability has been satisfied.

E.   Duty to Provide and Utilize Reasonably Safe Work Practices & Tools

The U. S. Supreme Court has unequivocally held that juries in a FELA suit are permitted to consider evidence of alternative work methods and work practices when determining whether a railroad provided its employees with a reasonably safe place to work.

In *Stone v. New York, C., & St. L. R. Co.,*[97] the plaintiff, a railroad maintenance worker, injured his back while removing worn out track ties.  The ties usually were pulled by two men

---

[94] *Id.*
[95] *Id,* 372 U.S. at 122.
[96] *Id.* 372 U.S. at 109-113.
[97] 344 U.S. 407 (1953).

using tongs and by three or four men if spikes protruded through the tie into the ground.   The

Supreme Court noted that there were "three alternative ways" to remove the ties and Stone was

instructed to use one of the three methods.   The Supreme Court characterized the case as

"peculiarly one for the jury," and held that the jury should hear evidence of available reasonably

safe alternative work methods to determine whether the railroad was reasonable.   The Court

observed:

> The experience with stubborn ties, *the alternative ways of removing them*, the
> warning by [the plaintiff] that he had been pulling as hard as he could, the
> command of his superior to pull harder, the fact that more than two members were
> usually used in the circumstances – all these facts comprise the situation to be
> appraised in determining whether [the railroad] was negligent.   *Those
> circumstances were for the trier of fact to appraise.*[98]

Federal and state courts throughout the United States in FELA actions have frequently

applied the guiding principles of *Stone* in admitting evidence of safer alternative equipment and

safer methods of performing work.

For example, in *Rodriguez v. Del Ray Connecting RR,*[99] a track worker injured his back

while using a heavy hand tool.   At trial, he contended the railroad was negligent for not

providing an automatic spike puller instead of requiring his crew to use the old fashion maul and

crowbar.   The Sixth Circuit rejected the railroad's argument that it was not obligated to provide

the latest and best tools, and recognized the railroad's fundamental FELA duty to provide tools

that are "reasonably safe and suitable for the use of the employee."

---

[98] *Stone, id,* at 408 (emphasis supplied).
[99] 473 F.2d 819 (6th Cir. 1973).

In *Rodriguez,* the Sixth Circuit relied on *Stone* to conclude that alternative work methods "often have a significant bearing on whether an employer-provided tool is reasonably safe under the FELA."[100]  The Sixth Circuit reasoned:

> What is "reasonably" safe is affected to some extent by the alternatives.  Here there was testimony that safety was an advantage of the hydraulic spike remover.  In view of this evidence and considering the special treatment afforded FELA cases, we cannot say that the jury was not entitled to find that the old spike maul method was "unreasonable."[101]

When equipment is available that is reasonably safer for an employee to use than the equipment the employee was actually assigned to use, *the availability of a safer alternative is part of the facts and circumstances relevant to determining the railroad's negligence.*[102]

---

[100] *Id.*

[101] Rodriguez v. Del Ray Connecting RR, 473 F.2d 819 (6th Cir. 1973), citing *Chicago & N.W. Ry. Co. v. Bower,* 241 U.S. 470, 36 S.Ct. 624, 60 L.Ed. 1107 (1916).  Emphasis supplied.

[102] *See, e.g., Riggs v. Missouri-Kansas-Texas R. Co.,* 508 P.2d 850 (Kan. 1973) (plaintiff injured checking brake lines with a flare claimed he should have been furnished an air compressor); *Eaton v. Long Island R. Co.,* 398 F.2d 738 (2nd Cir. 1968) (plaintiff claimed that an inexpensive ladder was safer than wooden blocks as a means of egress from a work pit); *Heater  v. Chesapeake & O. Ry. Co.,* 497 F.2d 1243 (7th Cir. 1974) (mechanical crane could have been used to avoid manual lifting); *Daniel v. Pittsburg & L.E.R. Co.,* 389 F.2d 922 (3rd Cir. 1968) (crane would have been safer than manual lifting of a 475 pound rail anchor machine); *Moore v. Seaboard Coast Line R. Co.,* 291 So.2d 656 (Fla. Dist. Ct. App. 1st Dist. 1974) (manual lifting of box car doors instead of a derrick); *Hack v. New York, C. & St. L.R. Co.,* 169 N.E.2d 372 (1st Dist. Ill. 1960) (manual lifting by a track worker could have been accomplished by a mechanical device); *Harbin v. Burlington Northern R. Co.,* 921 F.2d 129 (7th Cir. 1990) (alternative methods of ventilation or alternative personal protective equipment could have prevented the inhalation of injurious quantities of soot); Delvecchio v. Metro-North R.R. Co., 2004 U.S. Dist. LEXIS 24807, 2004 WL 2851951, *2 (D. Conn. 2004) (while proof of a safer alternative method is not necessarily proof of negligence, "it is equally true that proof of alternatives is not necessarily irrelevant to the issue of a defendant's negligence"); *Cook v. CSK Transp.,* 2009 WL 1749372, *7. (S.D.W.Va., 2009); *Combs v. Norfolk and Western Railway Company,* 507 S.E.2d 355, 359 (Va. 1998).

F.  BNSF's Empowerment Policy vs. 45 U.S.C. §54 (Abolishing Assumption of the Risk)
&
BNSF's Empowerment Policy vs. BNSF's Non-Delegable FELA Duties Owed to Plaintiff

In an odd twist which is not germane to its motion for summary judgment, in its brief BNSF revealed a genuine issue of material fact regarding the efficacy of its *empowerment policy* by stating, "[a]ll railroad workers, including Hernandez, are *empowered* not to engage in any task which might cause injury and to take the safe course when in doubt . . . ."[103]  Actually, BNSF emphasizes that its employees are empowered to take responsibility for their personal safety, as well as the personal safety of fellow employees.

Then, BNSF quoted Mr. Hernandez's testimony that he always tries to take the safe path. BNSF omitted Mr. Hernandez's testimony that, with respect to the job being supervised by Mr. Rusler, he felt Mr. Rusler was not "doing things the safe way."[104]

Here, it appears BNSF submits that Mr. Hernandez was contributory negligent for continuing to work at Mr. Rusler's direction even though Mr. Hernandez did not feel it was safe to do so.  In doing so, BNSF injects a genuine issue of material fact that defeats its motion for summary judgment.

BNSF's *empowerment policy* is nothing more than a backdoor effort to invoke the prohibited defense of assumption of risk.  And, it is BNSF's attempt to transfer to Mr. Hernandez BNSF's continuing non-delegable duty to use reasonable care to provide its employees with a reasonably safe place to work.  This non-delegable FELA duty is owned by the railroad and the duty is not transferable to BNSF's employees.

---

[103] BNSF motion, page 4 ¶6.
[104] Appendix A, p. 004 (Hernandez depo. 35/9-12).  Emphasis supplied.

An injured railroad employee cannot be held to have assumed the risks of his employment when his injury resulted in whole or in part from the negligence of his railroad employer.[105]

Merely doing a dangerous job or working under unsafe conditions is not contributory negligence.  Rather, that is the outlawed doctrine of assumption of the risk.  An employee cannot be faulted, nor have his damages reduced, merely because he worked at an unsafe job when the defendant railroad itself created or allowed the unsafe condition.[106]

By statutory amendment in 1939, Congress abolished assumption of the risk as a defense under the FELA.

> "In any action brought against any common carrier under or by virtue of any of the provisions of this chapter to recover damages for injuries to, or the death of, any of its employees, such employee shall not be held to have assumed the risks of his employment in any case where such injury or death resulted in whole or in part from the negligence of any of the officers, agents, or employees of such carrier..."[107]

A railroad employer has a continuing non-delegable duty to use reasonable care to provide its employees a safe place to work.[108]  Moreover, the railroad's duty of care becomes more imperative as the risk increases.[109]  The FELA imposes a higher standard of care beyond the general duty of reasonable care that the law requires of everyone.[110]  It has been noted that the failure to furnish a safe place to work is the most common basis for action under the FELA.[111]  In *Hines v. Conrail* [112] the Third Circuit wrote:

---

[105] 45 U.S.C. §54.
**[106]** *Birchem v. Burlington Northern R.R.*, 812 F.2d 1047, 1049 (8th Cir. 1987)
[107] 45 U.S.C. §54.
[108] *Bailey v. Central Vermont Ry.*, 319 U.S. 350 (1943).
[109] *Id*, at 353.
[110] *Kernan v. American Dredging Co*., 355 U.S. 426 (1958).
[111] *Nivens v. St. Louis Southwestern Railway Co.*, 425 F.2d 114, 118 (5th Cir. 1970).
[112] 926 F.2d 262 (3rd Cir. 1991).

"FELA was passed in 1908 in an effort to provide a tort compensation system for railroad workers who, at the time, experienced among the highest accident rates in United States history (Citation omitted). In a series of decisions starting with *Rogers v Missouri Pacific Railroad Co*., 352 U.S. 500, 77 S. Ct. 443 (1957), the Supreme Court broadened FELA's standards of fault and proximate cause. (Citations omitted). In *Rogers*, the Court held that 'the test of a [FELA] jury case is simply whether the proofs justify with reason, the conclusion that employer negligence played any part, even the slightest, in producing the injury or death for which damages are sought.' Moreover, the Court held that it was irrelevant whether the jury could also 'with reason, on grounds of probability, attribute the result to other causes, including the employee's contributory negligence.' *Rogers* 352 U.S. at 506"

As a FELA defendant, BNSF is not permitted to put introduce evidence of "contributory negligence" as a masquerade for the outlawed defense of assumption of the risk.[113]

Also, it does not constitute contributory negligence for a railroad worker to accede to the request or direction of the responsible representatives of his employer that he work at a dangerous job, or in a dangerous place, or under unsafe conditions.[114]

CONCLUSION

The presence of genuine issues of material fact defeats BNSF's motion for summary judgment.

Plaintiff Keith Hernandez has presented competent summary judgment evidence that establishes BNSF breached its legal duty to provide him with a reasonably safe place to work and also breached its duty to provide Mr. Hernandez with a reasonably safe supervisor.

Further, Mr. Hernandez has presented competent summary judgment evidence of genuine issues of material fact regarding whether, under the circumstances, BNSF was negligent, whether

---

[113] *Tiller v. Atlantic Coast Line R.R.*, 318 U.S. 54, (1943); *Taylor v. Burlington Northern R.R*, 787 F.2d 1309, 1316-1317 (9th Cir. 1986).
[114] Devitt, Blackmar and Wolff, *Federal Jury Practice and Instruction* §914.16 (4th Ed., 1987).

BNSF's negligence was foreseeable, and whether BNSF's negligence in whole or in part, no matter how slight, caused Mr. Hernandez injury.

BNSF's motion for summary judgment must be denied, and Mr. Hernandez so prays.

<u>Certificate of Service</u>

On March 11, 2014, I electronically submitted this document to the clerk of this Court, using the electronic case filing system of the court. I hereby certify that I have served all counsel of record[115] electronically or by another manner authorized by FRCP 5(b)(2).

Respectfully submitted,

**ATTORNEYS FOR PLAINTIFF**
THE WOMBLE LAW FIRM
1814 Memorial Drive
Houston, Texas 77007
713-650-6000 (office)
713-650-1932 (fax)
&
LOVELL LOVELL NEWSOM & ISERN
112 West 8th Avenue, Suite 1000
Amarillo, Texas 79101-2314
806-373-1515 (office)
806-379-7176 (fax)

By: _____
    W. T. Womble
    Texas Bar No. 21881000
    wt@womco.com
    Will Womble
    Texas Bar No. 24058184
    will@womco.com

    Joe L. Lovell
    Texas Bar No. 12609100
    joe@lovell-law.net

---

[115] Jeffrey J. Wolf (State Bar No. 21849012) jwolf@wolflawpc.com and Lauren M. Lockett (State Bar No. 24013886) llockett@wolflawpc.com, The Wolf Law Firm, 1360 N. White Chapel Blvd., Southlake, Texas 76092; 817-552-9653; 817-552-0300 (fax).